IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 18, 2025 Session

## VIRGINIA DODSON-STEPHENS, ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 19C273, 20C206       Clifton David Briley, Judge**

_____

### No. M2024-01006-COA-R3-CV
_____

This appeal arises from a lawsuit filed by a mother, individually and on behalf of her daughter, against the Metropolitan Government of Nashville and Davidson County and the State of Tennessee after her daughter sustained paralyzing injuries while attending a public school. After a four-day bench trial, the trial court found that both defendants were negligent and that each was fifty percent at fault for the child's injuries. The trial court found that the plaintiffs should be awarded total compensatory damages of $10,902,348.02, but it reduced the judgment to $600,000 ($300,000 against each defendant) in accordance with the applicable statutory caps. Metro has appealed, while the State has not. For the following reasons, we affirm the decision of the circuit court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

Jessica Brook Heavener and A. Allen Smith, III, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville & Davidson County.

R. Steven Waldron, Murfreesboro, Tennessee, for the appellees, Virginia Dodson-Stephens, individually, and Courtlynn Dodson, by and through Conservator Virginia Dodson-Stephens.

Jonathan Skrmetti, Attorney General and Reporter; Heather C. Ross, Senior Assistant Attorney General; and Lily-Ana Fairweather, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

The facts of this case are tragic. The child at issue, Courtlynn, was born in 2001. In 2003, Courtlynn's biological mother was hospitalized for domestic abuse and left two-year-old Courtlynn in the physical care of a teenage co-worker. The teenage co-worker took the child to her home and sought assistance from her mother, Virginia Dodson-Stephens ("Mother"), who was a police officer. Courtlynn weighed only thirteen pounds and was "a horrific sight." Her baby teeth were rotten, and she still drank from a bottle. She did not know about running water, television, or toys, and she "didn't really speak" or know how to interact with people. Mother later learned that Courtlynn's biological mother was addicted to drugs and alcohol, and Courtlynn had been born premature and hospitalized for three weeks due to neonatal abstinence syndrome. Courtlynn was also the product of incest, and she had already been the victim of sexual and physical abuse during her short life. Over the next two years, Mother took steps to obtain guardianship, terminate parental rights, and ultimately adopt Courtlynn.

From the beginning, it was obvious to Mother that something was "not right" with Courtlynn, so she sought medical care and testing for her. As a toddler, Courtlynn would use parts of her sandals to cut her feet or the zipper on her shorts to cut her leg. Her first real indication of mental illness began at nearly four years old, when Courtlynn started to exhibit self-harming behaviors like rubbing her face on the carpet until skin came off and banging her head into the wall. She was admitted for several days to Vanderbilt Pediatric Psychiatric Unit. Doctors informed Mother that Courtlynn had severe psychological issues and advised her that the damage done before age two was permanent. She was diagnosed with post-traumatic stress disorder and reactive attachment disorder and placed on medication. Although Mother did not want to believe it at the time, doctors warned her about "how horrific this was going to be" and even referred to the child as a predator.

Courtlynn was enrolled in the public school system as a preschooler and had an individualized education program ("IEP"). Mother was always actively involved in the development of the plans.[1] Courtlynn would self-induce vomiting at school and be sent

---

[1] The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, "'offers federal funds to States in exchange for a commitment to furnish' the core guarantee of a 'free appropriate public education . . . to all children with certain physical or intellectual disabilities.'" *A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 339-40 (2025) (quoting *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017)). "[O]nce a State accepts the IDEA's financial assistance, it must provide 'special education and related services,' including 'instruction tailored to meet a child's unique needs and sufficient support services to permit the child to benefit from that instruction.'" *Id.* at 340 (quoting *Fry*, 580 U.S. at 158).

The IDEA's "primary vehicle for implementing these congressional goals is the

home.  By the age of five, Courtlynn was killing animals.  On one occasion, Mother awoke to find Courtlynn standing over her with a butter knife, stating that "the voices" had originally told her to kill Mother with a gun, but then they said to use a knife because "that would be too messy."  At some point, Courtlynn tried to kill a teacher at school and was "put out of public school."  Mother quit her job to stay home with Courtlynn.  Courtlynn had in-home intensive therapy three days per week.

At age nine, Courtlynn was admitted to the Middle Tennessee Mental Health Institute after she "cheeked her psych meds" and fed them to the family dog, which poisoned him.  She continued in a cycle of killing animals, being committed to a facility, returning home for "another chance," and repeating the same behavior.  She also continued to exhibit self-harming behavior and tried to hide it from Mother.  According to Mother, Courtlynn hears the voices in her head "louder than anything else in her life," and that only intensified as she grew older.  She experienced suicidal and homicidal ideations from the voices.  Courtlynn was diagnosed with dissociative identity disorder and has five distinct personalities.  She was also diagnosed with complex psychotic disorder, post-traumatic stress disorder, mood disorder, major depressive disorder with psychotic features, ADHD, bipolar disorder, conduct disorder, sexual disorder, and neonatal abstinence syndrome.  She was diagnosed with a permanent disability as "severely emotionally disturbed."

Mother had to call law enforcement many times over the years to help her deal with Courtlynn's behavior.  Courtlynn switched the batteries in the smoke detectors to render them inoperable and started a fire in the house.  She attacked Mother once while she was driving and had to be removed by another driver who stopped to help.  She also attacked Mother's grandchildren.  She killed a guinea pig and a litter of kittens, stating that she wanted to make jewelry out of their bones.  Courtlynn was admitted to numerous facilities for various lengths of time.  In between her stays in facilities, Mother sought help from various psychiatrists and psychologists.  All of the facilities provided educational services for Courtlynn while she was admitted for extended periods, and she always had an IEP at each facility.

At around age fifteen, Courtlynn was sent to a residential facility called Hermitage Hall after killing a dog.  She had a rough stay and made no progress while there.  Toward the end of Courtlynn's stay, she was sent for an overnight visit at home, and she told Mother that the voices were telling her to kill herself and Mother.  Courtlynn's doctor at the facility informed Mother that there was no way that Courtlynn could safely return home, and they

---

'individualized educational program' (IEP)." *Honig v. Doe*, 484 U.S. 305, 311 [] (1988).
An IEP "spells out" for each child with a qualifying disability "a personalized plan to meet all of the child's 'educational needs.'" *Fry*, 580 U.S., at 158 [] (quoting § 1414(d)(1)(B)).
It is developed through a collaborative process between a child's parents, teachers, and school officials. See *id.*, at 158[].

*Id.*

had exhausted every option that was left. She told Mother that the only thing left to do was see if the Tennessee Department of Children's Services could get Courtlynn the help she needed. Mother admittedly believed "we were at the end of our rope." Her doctor made a referral to DCS. Mother then began working with DCS, believing that she would be part of a team of people working to do what was best for Courtlynn. She participated in child and family team meetings and provided detailed information about Courtlynn's history. A child and family team meeting summary from September 2016 stated that Courtlynn would enter a "[l]ong-term group home" with a "Desired Outcome" of becoming mentally stable and being able to return home to her family. In December 2016, the Juvenile Court of Rutherford County entered an adjudicatory and dispositional order, placing custody of Courtlynn with DCS. The order stated she was "without a parent" because "the child's needs were greater than mother could provide," but "there is expressly no finding of neglect against mother."

Initially, DCS placed Courtlynn at a facility in Memphis, the Girls Center for Intensive Residential Treatment, operated by Youth Villages. This was a Level 4 treatment facility, the highest level of care available. Courtlynn attended school at Nicholas Hobbs Academy, which is on-site and is also run by Youth Villages. Around this time, Mother learned that she was restricted to four hours of supervised visitation per month, which was apparently due to concerns about her safety. Therefore, any visits she had with Courtlynn had to be set up by Courtlynn's therapist at the facility. Once a visit was approved, Mother traveled to Memphis and visited Courtlynn. Based on that visit, Mother did not believe that Courtlynn was doing well. Courtlynn's DCS caseworker was Cortney Smart. Mother reported to DCS that Courtlynn was self-harming at the facility, and she continued to voice these concerns at the next child and family team meeting. The team also discussed that Courtlynn had engaged in "unauthorized movement" by leaving an area of the facility without permission.

After a few months at GCIRT, however, Courtlynn was "stepped down" to the nearby "Youth Villages Bartlett campus" in March 2017. The Bartlett campus had Level 3 residential supervision.[2] Mother told everyone at the child and family team meeting that she was not happy with this decision. According to DCS, Courtlynn was permitted to "step down" a level of supervision, even though she continued having auditory hallucinations, because she was making progress in using coping skills to deal with them. While housed at the Bartlett campus, Courtlynn continued to attend school at Nicholas Hobbs Academy.

During the summer of 2017, Mother attended a foster care review board meeting and voiced her concerns about Courtlynn's safety, believing that she was not "being heard" at the child and family team meetings. In response, the juvenile court entered an order, on

---

[2] According to the testimony in this case, a Level 4 facility typically has locked doors requiring keycard access and a staff to student ratio of 1:4 around the clock. A Level 3 residential facility, by comparison, has a staff ratio of 1:5 during the day and 1:8 at night, with secured doors but not keycard-only access.

August 25, 2017, containing a "safety plan" for Courtlynn that was "made into a Court Order." The order stated that "all parties" were required to comply with its provisions. The safety plan required the parties to restrict Courtlynn's access to any item in the cottage or courtyard that could be used for self-harm, such as cleaning supplies, staples, paper clips, and sharp items. The safety plan noted that Courtlynn had typically exhibited high risk behavior against her mother and animals, stating that she heard voices telling her to kill animals. The plan listed specific steps to be taken in the event that Courtlynn was threatening self-harm, and it required her to be directly supervised by staff at all times when she was outside, to ensure that she was not self-harming or able to harm others. The safety plan stated that Courtlynn reported being involved in a fight with her peers in the last thirty days. The plan noted Courtlynn's report that she "hears screaming voices in her head constantly" and, while at Hermitage Hall, had "visions of bloody things." The safety plan noted she had a history of self-harm, suicidal and homicidal ideations/attempts, auditory and visual hallucinations, runaway behavior, fire-setting, and physical aggression.

Just one month later, in September 2017, another child and family team meeting was held, and Courtlynn's counselor at the Youth Villages Bartlett campus wanted to discuss another "step-down" for Courtlynn, this time to a group home and a public school. She reported that Courtlynn was making progress and had not had any "critical incidents" since the previous month. Courtlynn also participated in the meeting and stated that was "using the coping skills when the voices are loud" and wanted to transition to a group home and try going to a public school. Courtlynn reportedly stated that she wanted to try Wallace Group Home in Nashville, where the youth participate in extracurricular activities and get an allowance. She stated that she was managing the voices better and "not listening to them." The counselor from Youth Villages reported "the school staff at Youth Villages feels that [Courtlynn] would be successful in public school." DCS's regional psychologist also believed that Courtlynn "could step-down with support." However, Courtlynn's court-appointed special advocate ("CASA") disagreed and expressed concerns about Courtlynn's mental health. She wanted to have a new psychological evaluation performed in order to understand the voices Courtlynn heard. Courtlynn's guardian ad litem agreed with the CASA and opposed moving Courtlynn to Wallace Group Home due to concerns about her history and the "need to protect all parties" involved. Mother likewise repeated her concerns about safety and expressed that she was "fearful of [Courtlynn] being in public school." She expressed concerns about supervision in a group home setting and reiterated her concerns that Courtlynn's mental health was not being addressed and that she continued to self-harm. She requested that someone "outside of Youth Villages" conduct a psychological evaluation. The counselor from Youth Villages was in favor of Courtlynn attending a "Pre-Placement Visit" at a group home with a strict safety plan in place, but Mother did not agree with this idea. According to Mother, she "kept trying to tell them" Courtlynn "wasn't going to be able to process a public school" and group home. The meeting summary states that someone suggested the team explore "an alternative school option" such as W.A. Bass Learning Center in the event that Courtlynn did move to Wallace Group Home. The summary ended by stating that DCS caseworker Cortney Smart

would consult with and invite the DCS Education Specialist to the next meeting.[3]

The following month, in October 2017, Courtlynn underwent a psychiatric evaluation at the University of Tennessee Health Science Center. The psychiatric evaluation was performed by Dr. Jerry Heston, a child and adolescent psychiatrist. Notably, Dr. Heston was the only psychiatrist involved in the decision-making process for Courtlynn. According to Dr. Heston's report, Courtlynn was referred by DCS "for diagnostic clarification and treatment recommendations," as her DCS caseworker and her therapist at Youth Villages were "concerned with Courtlynn's current diagnoses and would like to have her symptoms reevaluated." The report began by noting that Courtlynn had a history of aggression, killing animals, suicidal and homicidal ideations/behaviors, and auditory hallucinations. Dr. Heston's twelve-page report explained that Courtlynn had "lived in and out of residential facilities" since the age of four, and her "mental health and behavior concerns have persisted despite treatment and medication." The report stated that Courtlynn had been "stable and safe" for the past sixty days at the Youth Villages Bartlett campus, and Youth Villages was recommending that she be stepped down to a Level 3 group home, such as Wallace Group Home, even though "Courtlynn has continued to engage in self-harm behaviors" and "continues to hear multiple voices several times a week." The report noted that Mother, Courtlynn's guardian ad litem, and CASA all "expressed concerns that Courtlynn is not ready to step down to another group home where she would have increased independence."

The report described Courtlynn's current treatment at Youth Villages Bartlett campus, which included individual therapy once per week, group therapy three times per week, and family therapy twice per month. She also had supervised visitation with Mother. Her various medications were also listed. Dr. Heston's report stated that Courtlynn had "accrued several Critical Incidents for aggression and self-harm during her most recent placements." She had engaged in fights with peers twice, and on another occasion, became verbally aggressive toward staff and peers and banged her head on a wall resulting in a knot on her forehead. He noted that during an incident in August 2017, she became upset that peers were lying about her, ran across campus, fought with staff when they reached her by hitting and biting, then picked up a stick and began to self-harm and swing it at staff. He added, "All incidents resulted in physical restraint." Courtlynn had reportedly told her Youth Villages therapist that she felt "like a caged animal" and was "prepared to [begin]

---

[3] DCS required Mother to complete a parenting assessment. The assessment concluded that it was "not a parenting failure of [Mother] to not be able to manage [Courtlynn's] destructive behaviors in the home," as she verbalized appropriate parenting beliefs, appropriate parenting skills, and knowledge of specialized disciplinary skills for traumatized children. Regarding Courtlynn, the assessor opined that "her treatment at this residential facility has not been successful," so "it would be illogical to conclude that treatment at a less restrictive group home would be appropriate for [Courtlynn]." In fact, the assessor believed it would be "highly dangerous for [her] and others to step her down to a group home in a community setting." The assessor recommended that Courtlynn be reevaluated by a "non-partisan psychiatrist" to determine future placement to include "a secure, long-term state facility[.]"

the process of reunification in the community."  Her therapist believed "Courtlynn would be extremely successful in a community setting with continued therapy[.]"

Dr. Heston's report described Courtlynn's description of her multiple personalities, which, she said, had "been there her 'whole life.'"  She reported that they "seem to get worse when she feels rejection or she is told 'no.'"  Dr. Heston also described his interview with Mother.  Her concern was that Courtlynn remained "a danger to self and others."  She was concerned that Courtlynn had recently "snorted her meds" with a peer and continued to self-harm in ways that Youth Villages did not seem to appreciate, such as taking very hot showers or eating 22 slices of pizza on a field trip.  She opposed moving Courtlynn to a lower level of care and "continue[d] to think Courtlynn is unsafe," reporting that she must be supervised at all times of the day and night.  Courtlynn's guardian ad litem also spoke with Dr. Heston and informed him that she "shared the mother's concern about safety," as "the severity and nature of Courtlynn's aggression" was different than other children with whom she had worked.

Dr. Heston's report also contained a detailed description of Courtlynn's history of admissions to various facilities.  She had been to at least seven different residential inpatient facilities and also participated in intensive in-home services.  From the records in his possession, Dr. Heston estimated that Courtlynn had spent at least 38 of the last 54 months in institutional settings, dating back to when she was 12.  Thus, he estimated that, over the past few years, she had spent about 75 percent of the time in institutions.  Dr. Heston described various ways in which Courtlynn reported attempting to kill her mother, by poisoning her drink, pushing her down the stairs, attempting to stab her, and setting the house on fire.  She also had a list of people she planned to kill at one facility.  The report stated that Courtlynn also reported "multiple suicide attempts via choking, banging her head, beating herself, bashing her head, and trying to run through windows."  He noted that during her recent stay at GCIRT, earlier that year, her self-harming behaviors led to her being placed "on a 2:1 staff ratio precaution" for a month, and it was reported that she had a "mental kill list" at that facility as well.  Since her most recent step-down to the Bartlett campus in March 2017, she had received critical incidents for contraband, physical aggression, "unauthorized movements," and self-harm (biting herself).

Dr. Heston reported that Courtlynn was currently in the tenth grade at the school located on-site at the Bartlett campus, where she had an IEP for "emotional disturbance."[4]

---

[4] Under the IDEA, the term "child with a disability" means a child:

> (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and
> (ii) who, by reason thereof, needs special education and related services.

She also had a behavior support plan at the school "to address defiance, depression and anxiety." Dr. Heston reported that Courtlynn had "a history of being disruptive in the classroom, including physical altercations with teachers and peers[.]" She had previously attended a special classroom "for students considered to be unsafe in the mainstream classroom and in need of behavior modifications." When Courtlynn entered GCIRT, certain test results were "in the very low 4th to 5th grade range." However, Dr. Heston noted that the school staff at Youth Villages reported improvement in her grades and in the completion rate of her work, and "the school staff at Youth Villages feels that Courtlynn would be successful in public school."

Finally, Dr. Heston's report described his "Recommendations." He began by noting that "[t]his report should be shared with treatment providers and others involved in Courtlynn's care," as "[t]he expanded history, testing results, and formulation may allow consideration of other interventions that might be helpful to professionals working with Courtlynn to improve her overall functioning." First, regarding placement, Dr. Heston opined that "[s]trong consideration should be given to step-down into a group home for adolescents working on developing independent living skills." He stated that the group home would ideally offer some of the support and structure of residential placement with more ability to develop skills needed to live in the community. However, regardless of placement, Dr. Heston explained that Courtlynn would "continue to need adult support," either in the form of Mother advocating for her or support from her guardian ad litem. Regarding therapy/psychoeducation, Dr. Heston recommended that Courtlynn receive ongoing individual trauma focused therapy. He also suggested treatment with antidepressants and mood stabilizers. As for education, Dr. Heston recommended that "[a]s a part of a supported return to the community, Courtlynn should attend public school." Importantly, however, he added, "[s]he will require significant support for this transition as well." He stated that "[h]er IEP should be continued (as opposed to starting the new school and seeing if she still needs the IEP support)[.]" Dr. Heston also advised that "special education services should be in place when she transfers schools." Finally, he stated that "[c]lose follow up with school staff will be needed to modify the IEP as needed."

In the weeks after Dr. Heston's psychiatric evaluation, Cortlynn continued to have

20 U.S.C. § 1401(3). Courtlynn's IEP at Nicholas Hobbs Academy listed her primary disability as "Emotional Disturbance." It stated that she was placed in a residential facility and a "Non-public DCS Contract School." The IEP stated that her "emotional and behavioral inconsistencies impede her success in a general education classroom," and she had "a history of physical and verbal aggression as well as poor school performance." It stated that Courtlynn's behavior impeded her learning or that of others, which led the IEP team to address her behavior with a functional behavior assessment, behavior intervention plan, accommodations, daily point sheets, etc. It provided for small group and individualized instruction with behavior performance contracting as needed. The IEP provided that Courtlynn "will not participate with non-disabled peers in . . . the regular class. . . [d]ue to the academic and behavioral deficits, [she] is unable to participate in the general curriculum with the exception of age appropriate physical education."

incidents at the Bartlett campus. On October 24, 2017, she refused to go inside and made unauthorized movement toward the lake at the campus, then began to fight staff and was placed in a team control hold. Later that evening, she returned to her cottage but "destroy[ed] her room." She continued to state that she was going to kill a staff member and made another unauthorized movement outside "looking for the staff." She "saw the staff and ran to him fighting him." She was placed in a team control restraint and bit a staff member on the back of his arm. The incident report lists as a factor: "Anxiety about placement changes."

DCS conducted another child and family team meeting, by phone, on November 30. The meeting summary states that Mother was unavailable to participate. The team discussed Courtlynn starting pre-placement visits at Wallace Group Home. Courtlynn's CASA raised concerns that Courtlynn had been involved in at least three incidents at Youth Villages that had not been shared with the team, including cheeking her medication and snorting it with peers, being placed in holds for biting and aggression, and an incident "where the voices were bad" and Courtlynn assaulted staff. The therapist at Youth Villages "addressed these concerns," and the meeting became "very conflictual" between CASA and Youth Villages staff until the participants were redirected by the DCS team leader. Next, the team discussed education in the event that Courtlynn did transfer to Wallace Group Home. Youth Villages staff reported that girls enrolled at Wallace Group Home must attend W.A. Bass Learning Center, which is a public school in the Metro Nashville Public School System. It was reported that W.A. Bass was a smaller school set up as a transition school to provide an eleven-week transition period before students attend the general public school in that school zone. It was also reported that students with an IEP can stay at the school longer. At that point, DCS notified the team that Courtlynn's current IEP was set to expire the next day, so a new IEP would have to be completed before she left the Bartlett campus. Youth Villages staff informed the team that an additional IEP meeting would also have to be held, in any event, if Courtlynn started in the Metro school system, and this would include a safety plan for her. Finally, the team returned to the discussion of pre-placement visits at Wallace Group Home. The therapist from Youth Villages was in favor of the visits, but the guardian ad litem was "torn" given Courtlynn's challenges in the past and the possibility of regression. She ultimately agreed that Courtlynn deserved the chance to try but said "[t]he team needs to have their eyes wide open." CASA agreed. They suggested reconvening after Courtlynn attended some pre-placement visits.

On December 19, 2017, another child and family team meeting was held, and it was reported that Courtlynn had attended two pre-placement visits that went well. Mother participated in the meeting and reported that her recent visit with Courtlynn also went well. On January 3, 2018, the team convened for another child and family team meeting. According to Mother, she was not invited to participate in this meeting, and she only learned about this meeting afterward, when CASA contacted her to ask why she did not participate. Courtlynn read a letter stating that she wanted to attend Wallace Group Home.

By that time, she had been in DCS custody for one year. She had attended four pre-placement visits at Wallace and "had trouble" with one staff member, but that issue was reportedly being addressed. In Mother's absence, the team made the decision for Courtlynn to move to Wallace Group Home and attend W.A. Bass Learning Center. The meeting summary stated that the Bartlett campus would need to update its IEP and include a safety plan prior to her discharge, and then another IEP meeting would be held due to the fact that Courtlynn was moving to a new school and county. An IEP meeting was unexpectedly held in Bartlett on the same day as the child and family team meeting, January 3, without notice to Mother or DCS. Thus, neither Mother nor DCS participated in the January 3 IEP meeting.[5]

In early January, Courtlynn was moved from the Bartlett campus to Wallace Group Home. Wallace Group Home is a Level 3 facility with eight youth residents and a staff to student ratio of 1:4. The difference between a Level 3 "residential" facility and a Level 3 "group home" is that the residential classification means students attend school on campus. All of the youth at Wallace Group Home have mental health diagnoses, and all of the residents attend school, at least initially, at W.A. Bass.

On January 5, 2018, DCS caseworker Cortney Smart sent a "School Enrollment Letter" to W.A. Bass Learning Center, notifying the school that Courtlynn had been placed at Wallace Group Home and requesting assistance with enrolling her at the school. The letter stated that Wallace Group Home would be the primary point of contact for routine education issues. It stated that DCS had attached "prior school records" in its possession but that W.A. Bass should send a record request to Nicholas Hobbs Academy Youth Villages for her official education records. Finally, the letter requested that W.A. Bass notify Ms. Smart, her supervisor, Wallace Group Home, and Mother of all special education meetings. W.A. Bass Learning Center was also provided with an "Education Passport" for Courtlynn, which was compiled by DCS and stated that her "Current IEP" was included as an attachment.[6] The Education Passport stated that Courtlynn's two most recent schools were Nicholas Hobbs Academy at Youth Villages and Hermitage Hall. Aside from sending this information, however, DCS did not discuss Courtlynn's special education needs with anyone at W.A. Bass Learning Center, nor did DCS provide the school with any information regarding Courtlynn's aggressive behavior, suicidal ideations, self-harm, or auditory hallucinations.

Days later, on January 8, the program manager at Wallace Group Home, Tijuana Clairborne-Thompson, emailed W.A. Bass Learning Center to set up a meeting to enroll "a new youth" at the school. She addressed the email to the lead teacher at W.A. Bass,

---

[5] The January 3 IEP contained most of the same provisions recited above from the previous IEP, with one exception. It stated, "Explain the extent, if any, in which the student will not participate with non-disabled peers in [] the regular class: Full participation while in residential setting."

[6] There is some question as to whether a copy of the current or any other IEP was actually attached, given that DCS had not been invited to the January 3 IEP meeting.

LaTangela Laing-Freeman, and asked her to "take a look at her information" that was attached and let Ms. Thompson know when they could set up a meeting. The only attachments were Courtlynn's report card and transcript from Nicholas Hobbs Academy, birth certificate, immunization record, social security card, and a psychological evaluation from 2016, which had been performed to determine if Courtlynn continued to qualify for special education services. Ms. Freeman never read the attached psychological evaluation, as she printed the documents and placed them in a folder. However, it stated that Courtlynn "continues to qualify for Special Education services as a child with Emotional Disturbance," and she had tested in the 99th percentile for inability to learn, relationship problems, unhappiness or depression, and physical symptoms or fears.

An intake meeting was held at W.A. Bass Learning Center on January 11, 2018, for Courtlynn to be enrolled at the school in its Transition Program. The Transition Program enrolled about sixteen students and had four teachers, for a 4:1 supervision ratio. It included high school students from a wide range of backgrounds, including students coming to the program from incarceration or juvenile detention, students living in group homes or in DCS custody, and students on probation. As such, it was not uncommon for students at the school to have behavioral issues or mental health issues.

The only individuals who attended the intake meeting at the school were Courtlynn, Ms. Thompson (program manager of Wallace Group Home), and Ms. Freeman (lead teacher at the Transition Program).[7] These meetings typically last about thirty minutes. Ms. Thompson does not recall providing W.A. Bass with any documents regarding Courtlynn other than those attached to her initial email, and Ms. Freeman admittedly never read Courtlynn's psychological evaluation. In addition, Ms. Thompson has no recollection of informing anyone at the school of Courtlynn's mental health diagnoses. Ms. Thompson does not recall providing any information at the intake meeting indicating that Courtlynn had any behavioral issues. Ms. Freeman was not told that Courtlynn heard voices. W.A. Bass had no knowledge of the safety plan entered by the juvenile court or the recommendations of Dr. Heston regarding Courtlynn's transition. However, Courtlynn's application for enrollment, which was filled out that day, did state that she had an IEP for special education services, lived in a group home, and last attended Nicholas Hobbs Academy. As lead teacher of the Transition Program, Ms. Freeman knew that a transfer student with an existing IEP is "going to need a new one" at W.A. Bass upon enrollment, which means that a new IEP meeting must be held. Such a meeting would give the team the opportunity to be "brought up to date" on the new student's education, medical needs, psychological needs, safety needs, and behavioral issues.

---

[7] Mother did not see Courtlynn during this timeframe. DCS did not initially inform Mother that they had moved Courtlynn to Wallace Group Home. Once she learned that Courtlynn had been moved, she tried unsuccessfully to contact the therapist at the facility to set up her supervised visitation. She ultimately lodged a complaint about the therapist. However, Mother did not see Courtlynn at all in December or January. Mother did not initially know what school Courtlynn was attending either, as DCS did not inform her that Courtlynn was enrolled in public school.

Even though W.A. Bass Learning Center was on notice that Courtlynn had an IEP at her previous school and was a special education student, inexplicably, no IEP meeting was held for Courtlynn over the next six weeks. Thus, when Courtlynn started public school at W.A. Bass, she did not have special education services in place for her. The school did not make any accommodations for Courtlynn in accordance with special education services.

On January 25, 2018, DCS caseworker Cortney Smart visited Courtlynn at Wallace Group Home and spoke with her privately. Courtlynn told Ms. Smart that "she really [did] not like her current placement." She said she "felt as though she was forced to come to Wallace." Courtlynn stated that she had informed her previous therapist at the Bartlett campus that she felt she needed more time and a couple more visits before making the move. Courtlynn told Ms. Smart that she was forced to read the letter to the team about wanting to move to Wallace when she did not even write it, and she was not allowed to vocalize her needs. Courtlynn told Ms. Smart that "she has been hearing her voices" but "they have not been that loud." She told Ms. Smart that she had not felt comfortable enough to talk to anyone at Wallace "about her voices." Ms. Smart encouraged Courtlynn to speak with her counselor "when her voices are loud." However, Ms. Smart did not recall taking any other action in response to this conversation, such as notifying the school or anyone else. Courtlynn's counselor at Wallace Group Home was not made aware of this conversation and did not know that Courtlynn was hearing voices while at Wallace.

The next time Ms. Smart had any contact with Courtlynn was three weeks later, on February 19, when she visited her again at Wallace Group Home. Courtlynn stated that she had taken a Xanax at school a couple of weeks earlier because "she has been feeling down and struggling with an internal issue and her classmate offered her a Xanax to help cope." Ms. Smart asked Courtlynn "what she was struggling with" but she refused to disclose it. She said she wanted to try and work it out on her own. Ms. Smart does not recall notifying Courtlynn's school or her mother about this conversation, although she may have mentioned it to someone at Wallace.

Four days later, on February 23, Courtlynn was in science class at W.A. Bass Learning Center when her teacher left his classroom unsupervised for a period of about ten minutes. Courtlynn and other students wandered into the hall. Upon returning to the classroom, which was on the second floor of the school, Courtlynn apparently opened a large window inside the classroom. The vertical window "open[ed] like a door," did not have any locking mechanism, and "open[ed] out big enough for somebody to step out of," as it may have once been used as a fire escape but had no ladder or stairs beneath it. Courtlynn jumped out of the window and landed in the grass below. An incident report states that Courtlynn reported hearing voices telling her to run away through the window. Sadly, Courtlynn sustained paralyzing spinal injuries in the fall. She underwent a five-hour surgery but is now confined to a wheelchair and will never walk again. She no longer

has bladder or bowel function and must be catheterized every four hours.

In February 2019, Mother instituted this action by filing a complaint against Metropolitan Nashville Public Schools in the circuit court of Davidson County. The complaint was filed by Mother individually and by Courtlynn, by and through Mother as her conservator. The complaint alleged that Metro was negligent and that governmental immunity was removed under the Tennessee Governmental Tort Liability Act because the injury was proximately caused by negligent acts or omissions of Metro's employees or agents while in the scope of employment. Specifically, the complaint alleged that Metro Nashville Public Schools owed a duty of care to Courtlynn and had a duty to take reasonable precautions to protect her from unreasonable risk of injury while at school. The complaint alleged that it was reasonably foreseeable that a child with an extensive history of homicidal and suicidal issues, along with behavior problems, could harm herself or others if left unsupervised in a classroom with an unsecured window. The complaint alleged that Metro was negligent in providing inadequate supervision, failing to provide a safe environment, failing to take preventive measures, and violating school policies, among other things. The plaintiffs sought an award of compensatory damages in accordance with the GTLA.

Metro filed an answer, asserting that it did not breach any legal duty owed to the plaintiffs and that Courtlynn's actions were not foreseeable. To the extent that any negligence was attributed to Metro, it asserted that its liability must be reduced by the degree of fault attributable to DCS, due to DCS's failure to provide Metro with "sufficient notice" of Courtlynn's mental condition. The plaintiffs were then permitted to file an amended complaint, adding the State of Tennessee as a defendant and correctly identifying the original defendant as the Metropolitan Government rather than the school system. The amended complaint asserted that the State possessed all of Courtlynn's medical records once she entered DCS custody, and yet the State negligently enrolled Courtlynn in the public school system without providing Metro with sufficient notice of her medical history, diagnoses, and condition. The amended complaint further alleged that Mother had opposed placing Courtlynn in public school due to her diagnoses and previous behavior, and yet the State enrolled her in public school without Mother's knowledge. The amended complaint alleged that Courtlynn's injuries were reasonably foreseeable, not only considering Mother's warning to the State that there would be safety issues in a public school, but also due to Courtlynn's lengthy history of medical diagnoses, symptoms of suicidal and psychotic actions, and her behavior while in DCS custody. Thus, the plaintiffs sought damages from the State as well.[8] The State filed an answer to the amended complaint, denying that its employees were negligent, denying that the harm was foreseeable, and

---

[8] The plaintiffs also filed a written notice of claim with the Division of Claims Administration. In the Claims Commission, an agreed order was entered transferring the claim to circuit court to be consolidated for trial with the case pending there pursuant to Tennessee Code Annotated section 9-8-404(b). In the circuit court, an agreed order was entered dismissing the State as a party in the original circuit court action but consolidating the original circuit court action with the claim transferred from the Claims Commission.

asserting comparative fault against Metro.

A bench trial was held over the course of four days in December 2023. At the outset, the parties stipulated that Courtlynn's medical expenses totaled $402,348.02. Mother was the first witness to testify. She described the circumstances by which Courtlynn was placed in her care at the age of two and her efforts to terminate parental rights and adopt. Mother described the symptoms and behaviors Courtlynn displayed from a young age, which led to her first hospital admission at age four. Despite Courtlynn's daunting diagnoses, Mother testified that she "started fighting for her at that point," believing that she could show Courtlynn love and get her help. Mother testified regarding Courtlynn's self-harm over the years and Courtlynn's efforts to harm or kill Mother. According to Mother, Courtlynn would be deemed a danger to herself and others by her psychiatrists, they would commit her for a period, eventually they would send her home, and then she would do something else "horrific" to be re-committed. Mother testified that she was always actively involved with any facility where Courtlynn went for treatment. However, she said that as Courtlynn grew older, the acts she committed became more profound.

Mother testified that Courtlynn had always had an IEP, ever since she started school at the age of three. Mother said she was always actively involved in the development of those plans and always attended the IEP meetings to ensure that Courtlynn's best interest was being served. She noted that Courtlynn was no longer able to attend public school as a child after she "tried to kill a teacher at school." Mother testified that every facility where Courtlynn was admitted provided educational services, as "[a]nytime Courtlynn had to do an extended stay at a home, they'd have a school there." She explained that Courtlynn always had an IEP at each facility. She said even if the school was some distance away, she would still participate in the IEP meetings via telephone.

Mother testified about how Courtlynn entered DCS custody around age fifteen, when she was told by Courtlynn's psychiatrist that she could not safely return home and they had exhausted all options. She described this as a tough decision and said, "I wanted my child to have the help that she so desperately needed." Mother testified that she attended child and family team meetings with DCS and "everything that I was invited to," "[e]verything that I knew about, everything that I was included in, I attended." She testified that she was happy with the level of care at GCIRT, the Level 4 facility, and believed that was the level of care Courtlynn needed. However, she said she was "blindsided" to learn that she had been restricted to four hours of supervised visitation per month and experienced difficulties trying to get visits set up with Courtlynn's therapist at the facility. Mother testified that after she was allowed to visit and learned about incidents of self-harm and unauthorized movement, she expressed her concerns at the child and family team meetings to no avail. DCS moved Courtlynn to the Bartlett campus, a Level 3 facility. Mother testified that she ultimately attended the foster care review board meeting and went into great detail about everything that was happening and her fears that she was not "being heard," which led the juvenile court to enter the safety plan for Courtlynn in August 2017.

- 14 -

Again, the safety plan detailed Courtlynn's history of self-harm, suicidal and homicidal ideations/attempts, auditory and visual hallucinations, physical aggression, and runaway behavior, and it required restricted access to any item that could be used for self-harm, from cleaning supplies to paper clips. Just one month later, however, DCS started discussing moving Courtlynn to a group home and public school. Mother testified that she kept trying to tell the team that Courtlynn was not going to be able to successfully navigate a group home or public school. She testified that DCS was "brewing the perfect storm" by talking to Courtlynn about independent living and getting an apartment and a job without addressing her mental health issues, while Courtlynn continued to self-harm, act out behaviorally, hear voices, and cry for help. She said her greatest fear was that Courtlynn would kill herself or someone else. She testified that she was so "panicked" about the possibility of DCS moving Courtlynn that she contacted the Commissioner of Mental Health to ask for help. She testified, "I was so scared that they were going to move Courtlynn and something horrible was going to happen. And it just -- everything fell on deaf ears. No matter how much I spoke, no matter what I said, no matter who I contacted, nobody would listen to me. And they moved her anyway."

Mother recalled that there was a "panic" to get Courtlynn's IEP addressed before it expired, but she did not know if that was ever accomplished. She testified that she would have attended if she was notified. She testified that DCS had a child and family team meeting without inviting her, and that was apparently when the decision was made to actually transfer Courtlynn to Wallace Group Home. Mother testified that DCS did not even tell her that they had moved Courtlynn to Wallace Group Home or that she was in public school. So, Mother testified that she was not able to provide "adult support" during Courtlynn's transition, as recommended by Dr. Heston. She learned at some point that Courtlynn had moved to Wallace Group Home but again experienced difficulties contacting her therapist to set up supervised visitation. Mother testified that she was unable to see Courtlynn in December or January and was finally able to schedule a visit for late February, but before it occurred, she jumped out the window. Mother said she was not notified about Courtlynn taking Xanax, nor was she informed about Courtlynn's conversation with her caseworker about struggling with an internal issue.

Mother testified that W.A. Bass Learning Center never contacted her at all until Courtlynn fell from the window. She testified that if the school had held an IEP meeting upon Courtlynn's enrollment, she would have attended and told them that Courtlynn was a danger to herself and other people. Mother testified that she had attended "tons and tons of IEP meetings" for Courtlynn, and that type of information was always discussed – the fact that she required additional care. Mother testified that when a DCS supervisor called her on the afternoon of the incident, she reminded her that she had warned them that "something horrible was going to happen if they moved Courtlynn." Mother testified that she simply could not imagine that DCS would not listen to her as a parent or that a school would leave Courtlynn unattended in a classroom with "a window large enough for a body to go out of it."

- 15 -

Mother testified about her efforts, after the incident, to have the four-hour supervised visitation limits lifted so that she could stay with Courtlynn in the hospital. She said that the exceptional education teacher from W.A. Bass contacted her, while she and Courtlynn were still at the hospital, in order to set up an IEP meeting. Mother added, "They scheduled an IEP quick, fast, in a hurry after she went out that window." Mother participated in the IEP meeting, which was held on March 7, 2018.

Mother testified that Courtlynn was released to go home with her on April 10. Mother installed a wheelchair ramp, learned to catheterize Courtlynn, and cared for her at home for about ten months. However, she testified that Courtlynn did not take her medication one day and had a psychotic break, during which she attacked Mother and destroyed the home. Courtlynn was removed by ambulance and hospitalized. Mother testified that it is virtually impossible to find psychiatric placement options for Courtlynn now that she is paraplegic; however, Courtlynn has been in a series of adult living facilities ever since. Mother testified that Courtlynn has continued to self-harm, now that she has no feeling in her lower extremities, which has resulted in injuries "almost to the point of amputation."

The next witness to testify was Dr. Henry Johnson, the principal at W.A. Bass Learning Center.[9] Dr. Johnson testified that the school's Transition Program had about sixteen students and four teachers at the time of Courtlynn's enrollment. He testified that students in the Transition Program need that level of supervision because they have students who have come from incarceration, juvenile detention, group homes, DCS custody, etc. The program was originally designed to give students coming from incarceration "a step-down placement so they can get acclimated back to a regular school environment" before going back to their zoned school. The Transition Program also enables students to "recover credits," so some students come from zoned schools and do not have behavior issues. Students attend the Transition Program on a short-term basis, generally for only one semester. Dr. Johnson explained that the Transition Program is "not the typical high school program," and the students who attend "are not typical high school students." He testified that Transition students have attempted to run away from school. Dr. Johnson said that the mere presence of a teacher is a deterrent to poor behavioral decisions. He stated that the program is designed so that students have no time between classes for walking down the halls or going to lockers because the atypical students in the program need to be supervised "all the time."

Dr. Johnson identified a brochure that had been created about the Transition Program, which described it as serving students in grades nine through twelve "who are returning from short term incarceration," with a focus on "rebuilding their academic and

---

[9] Dr. Johnson explained that W.A. Bass Learning Center has three separate schools in one building: an alternative school, an adult high school, and the Transition program where Courtlynn attended.

social skills to allow for a smooth transition into an academic setting that will allow students to meet graduation requirements." The brochure stated, under the heading for "Behavior Intervention," that "[s]tudents are assessed upon entering the program and behavioral needs and concerns are addressed." Dr. Johnson testified that a "behavior intervention plan" is designed for students who have severe behavior issues in the classroom, and such a plan is normally referenced in and attached to an IEP. He testified that it is standard "protocol," when a new student comes to the school, to have a behavioral intervention assessment meeting with the special education teacher at the time of enrollment "or at least soon after enrollment" (and this meeting is separate and distinct from any IEP meeting). Dr. Johnson testified that knowing a student has an IEP also triggers the need for a behavioral intervention assessment. He acknowledged that Courtlynn should have had such an assessment "fairly soon after she began" on January 11, but she never did prior to her injury on February 23. Dr. Johnson conceded that this type of behavioral intervention meeting would have provided an opportunity for participants such as Courtlynn's mother, caseworker, or someone from her group home to meet with the counselor and special education teacher to talk about any behavioral issues she had, whether she might self-harm, or whether she was a runaway risk. Dr. Johnson acknowledged that the meeting would have also explored what the categorization of "emotional disturbance" meant in Courtlynn's case. He agreed this was an opportunity the school "just missed." Dr. Johnson explained that the Transition Program also has a "threat assessment team" that performs threat assessments when students threaten to harm themselves or others, and the school can implement a safety program for a student. He said a safety plan was drafted for Courtlynn after her injury.[10]

Dr. Johnson testified that the Transition Program also has an IEP team to determine the services needed for students. He explained that the school uses an application form, which is to be completed at the intake meeting, to specifically find out if a student has an IEP. He noted that Courtlynn's application indicated that she did. Dr. Johnson admitted that it is the school's responsibility to schedule and conduct IEP meetings, and such meetings need to take place within a certain amount of time after enrollment. It was his understanding that if the student's IEP is "out of compliance" then the meeting is to be held within ten days of enrollment. However, Dr. Johnson also testified that when a student has a previous IEP in place, "it's better to have an IEP meeting sooner than later." He said that an IEP meeting is an important tool that allows the school to determine if a student needs a safety plan because the meeting involves several people who can talk about the student and any behavioral issues. Dr. Johnson candidly admitted the school had "plenty of time"

---

[10] Dr. Johnson testified that the school was never made aware of Courtlynn's safety plan from juvenile court or the recommendations in Dr. Heston's report regarding the support she would need in order to transition to public school. He testified that knowing Courtlynn came from Nicholas Hobbs Academy, at the residential facility in Memphis, would not necessarily tell the school anything about her behavioral history. He also testified that the school generally does not have a child's medical records unless they are taking some medication during the day.

to get Courtlynn's IEP done before her injury but did not.[11]  He acknowledged that the school developed both an IEP and a safety plan for Courtlynn after she jumped from the window.  The post-injury IEP stated that "Courtlynn's disability negatively impacts her access to the general curriculum as she will do whatever she has to do in an effort to escape from uncomfortable situations."  The IEP stated that Courtlynn had a history of physical and verbal aggression and poor school performance, and the IEP team had addressed her behavior by developing a safety plan requiring her "to always have adult supervision."

Dr. Johnson testified unequivocally, "I expect students to be supervised at all times[.]"  He expected teachers at the Transition Program to remain with their students, especially during class periods.  Dr. Johnson acknowledged that when Courtlynn went out the window, her science teacher had left the room unsupervised.  He also admitted that the science teacher, Mr. Ballentine, lied about his absence from the room afterward to cover up the fact that he left the room unsupervised.  Time-stamped video surveillance of the hallway and exterior was introduced at trial.  Dr. Johnson testified that he did not recall how long Mr. Ballentine left the room unsupervised, but ten minutes would be "way too long."  He testified that even five minutes would be too long.  Dr. Johnson was not aware of any duties that Mr. Ballentine had outside of teaching his class during that period and said that Mr. Ballentine had never told him any reason he had for being out of the room that day.  However, Dr. Johnson also said that he had not "had occasion to discuss this event with him in detail," nor had he disciplined Mr. Ballentine.

As for the window, Dr. Johnson explained that it "opens like a door," is not locked, and can be easily opened by students.  He believed the window was once used as a fire escape, but it had no ladder or stairs to enable anyone to escape safely from the window.  Dr. Johnson testified that, according to the school incident report, other students told the teacher that Courtlynn was trying to run away, and he had not received any information to indicate that Courtlynn was doing anything besides running away.  He acknowledged that he had "dealt with runaways before" in the Transition Program.  However, he said that no one had ever jumped out a window or even been injured since the program began in 2010.

Michael Ballentine, the science teacher who left the classroom unsupervised, was the next witness to testify.  We note at the outset, however, that the trial judge found that Mr. Ballentine "lied in his statement at the time of the incident," lied approximately eight times during his deposition, and denied leaving his classroom unsupervised for ten minutes at trial under oath despite video evidence confirming that he did.  Thus, the trial judge found that "Mr. Ballentine has demonstrated his testimony cannot be believed," and the court rejected all of his testimony and declined to consider it.  For what it is worth, we will

---

[11] Dr. Johnson testified that sometimes the student's previous IEP is brought to the intake meeting, and sometimes it is not; however, it should not take more than a day or two to obtain the previous IEP if it is not provided.  He conceded that the school's lead teacher or exceptional education teacher could request a previous IEP, but neither of them did so for Courtlynn.

briefly discuss the testimony.

Mr. Ballentine testified that his science class generally had about four to six students. He said that on the day in question, another teacher was out and they had no substitute teacher, so the students from that classroom were in his class as well. He admitted at trial that he was not in the classroom when Courtlynn jumped but denied that he left the room unsupervised for ten minutes. Mr. Ballentine acknowledged that in previous statements about the incident, he stated that he saw Courtlynn jump out the window. "But," he admitted, "that was before I saw the video." He testified that he "thought" he saw Courtlynn jump out the window, but upon reviewing the video footage, he saw that was untrue. He then testified that he was out in the hallway unlocking the door for vendors to stock the vending machines. However, when shown video footage, he acknowledged that he spent a good bit of the time in a counselor/secretary's room down the hall, and he could not recall what he was doing in there. He eventually admitted that, as of 9:43 a.m., he had been out of his classroom and left his students unsupervised for approximately nine minutes and that he did not exit the counselor's room until 9:45 a.m. Several students walked in and out of Mr. Ballentine's classroom during the time he was gone. Mr. Ballentine admitted that he exited the counselor's room only after Courtlynn jumped and he heard raised voices and "some commotion."

Regarding the window, Mr. Ballentine said that it "never really made any sense" to him to have "an unlocked, big swinging door, window in that classroom." In fact, he had stated, apparently during his deposition, that he "thought it was crazy to have an unlocked window that big on the second floor [in] a classroom at that school," especially with a group of children who required 4:1 supervision. He testified that, in his position at the Transition Program, he was not "required to physically restrain students," and even though he did not witness what occurred, he opined that Courtlynn's incident "happened so quick" that he could not have stopped her if he had been in the room. At the same time, Mr. Ballentine conceded that teachers were trained in crisis prevention intervention each year, and if he saw that someone in his classroom was about to get hurt or hurt themselves, he would try to step in and stop that from happening. Like Dr. Johnson, Mr. Ballentine also conceded that the mere presence of a teacher supervising a classroom is a deterrent to inappropriate behavior by students.

Next, the trial court heard testimony from Tijuana Claiborne-Thompson, who was "program manager" at Wallace Group Home at the time of Courtlynn's brief stay there.[12] She oversaw the youth at the home, including their educational and behavioral needs. Ms. Thompson testified that because Courtlynn came to Wallace Group Home from the Bartlett campus, and both are operated by Youth Villages, she had access to Courtlynn's records from her previous facility. She said this included educational records, safety plans, behavior intervention plans, incident reports, etc. She could not recall ever seeing

---

[12] We refer to this witness as Ms. Thompson, as she was referenced during her testimony.

Courtlynn's safety plan from juvenile court. However, she testified that the counselor at Wallace would have also developed a safety plan for Courtlynn, probably within 24 to 48 hours of her arrival.

Ms. Thompson explained that it was her responsibility to assist with residents' school enrollment. She testified that she had access to all of Courtlynn's records from Youth Villages and could have produced any of that information to the school upon request. However, her email to the school prior to the intake meeting only included items such as her report card, transcript, and psychological evaluation, and she admittedly did not include Courtlynn's safety plan. Those few attachments were the only documents Ms. Thompson could recall providing to the school. She admitted that no policy of Youth Villages prohibited her from providing the school with Courtlynn's safety plan, and in fact, it was the responsibility of Youth Villages "to advise the school of any safety plan." She could not recall if she had any contact with DCS caseworker Cortney Smart prior to enrolling Courtlynn but testified that she was never advised of Dr. Heston's recommendation that Courtlynn needed to have special education services already in place at her new school. Ms. Thompson could not recall if she met with the counselor at Wallace Group Home at the time of enrollment to discuss any needs Courtlynn might have either. In fact, she did not recall meeting Courtlynn herself prior to enrollment. She had not communicated with Mother either.

Ms. Thompson testified that the only person she spoke with at W.A. Bass Learning Center regarding Courtlynn's enrollment was the lead teacher, Ms. Freeman, who attended the intake meeting. Ms. Thompson could not specifically recall Courtlynn's intake meeting but testified that she attends such meetings "nine times out of ten." She did not remember having a conversation regarding Courtlynn's behavior or mental health diagnoses. Ms. Thompson admitted that if Courtlynn had something like a nut allergy or hemophilia, she would have advised the school. She noted that the application filled out during the intake meeting did state that Courtlynn had an IEP for special education services and had attended Nicholas Hobbs Academy.[13] At the conclusion of Ms. Thompson's testimony, the trial judge asked if she had ever tried to enroll a student at the W.A. Bass Transition Program and been told that the program was not suitable for a student. Ms. Thompson said she had not. She stated that the only options for students at Wallace are the high school in that school zone or the Transition Program.

DCS caseworker Cortney Smart testified next. She began working for DCS in 2015 and was Courtlynn's caseworker from 2016 to 2018. She was no longer employed at DCS

---

[13] Ms. Thompson testified the "education passport" sent to the school stated that the IEP was enclosed, but she could not remember if it actually was. She could not recall if she took the IEP to the intake meeting but said if it was requested by the new school she could have obtained it from the previous school within a couple of days. She said it was possible there could have been some discussion about obtaining the IEP, but she just could not recall. She testified that an IEP can also be pulled "from school to school" through the "EasyIEP" statewide computer system.

by the time of trial. Ms. Smart testified that once Courtlynn entered DCS custody, she became responsible for Courtlynn's day-to-day care, including decisions regarding where she would reside, her medical care, and her education. As her caseworker, Ms. Smart was involved in all decisions regarding moving Courtlynn to and from various facilities. She conceded that Mother opposed the step-down to Wallace Group Home and public school. She acknowledged that Mother essentially warned them that she knew Courtlynn better than anyone and knew that she would get hurt if she went to a public school. However, Ms. Smart added, "We can make an assessment of that."

Ms. Smart was asked about various incident reports in the DCS file regarding Courtlynn's behavior between August and October 2017, just months before she started school at W.A. Bass in January 2018. For instance, an August 2017 report described an incident in which Courtlynn went running across campus toward the softball field, fought with staff when they caught up with her, hit and bit staff, and self-harmed with a stick. It stated, "She remains at risk for runaway and physical aggression." Ms. Smart acknowledged that at a child and family team meeting in September, the team started discussing moving Courtlynn to the group home and public school, stating that even though she was still hearing voices she was using her coping skills. Another DCS report from October 2017 described an incident in which she went toward the lake, destroyed her room, repeatedly said she was going to kill a staff member, started fighting him, and bit staff on the arm. The report listed as a factor "Anxiety about placement changes." When asked why she continued to support a step-down for Courtlynn in spite of these incidents, Ms. Smart testified that it was not her sole decision and that she agreed with "what the team suggested."

Ms. Smart testified that she knew Courtlynn would need an IEP and safety plan at W.A. Bass. She testified that Courtlynn's IEPs had always included the same provisions regarding a functional behavior assessment, behavior intervention plan, accommodations, etc. She said that Courtlynn had always had a safety plan in effect, partly due to her self-harming issues and partly due to safety concerns for others because of her history of aggression and harming other people. Even though Dr. Heston stated in his report it should be shared with treatment providers going forward, Ms. Smart could not recall if she ensured that any treatment providers or others involved in her care received the report. She only knew that it became part of Courtlynn's file. When asked if DCS took any steps to ensure that Courtlynn had special education services in place at the new school, as Dr. Heston suggested, Ms. Smart said, "I believe so," but she conceded that she relied on the person from Youth Villages who enrolled her at the school to make sure that happened. She admitted, though, that even if Youth Villages or an agent enrolled Courtlynn at school, it was her primary responsibility as Courtlynn's DCS caseworker to ensure that Courtlynn had an IEP in place. She also admitted it was her responsibility to make sure that the previous IEP and safety plan had been transmitted to W.A. Bass. When asked if she provided the IEP to W.A. Bass, she said, "If I can recall correctly, yes." However, she could not recall talking to anyone at the school about Courtlynn's special education needs,

aggressive behavior, auditory hallucinations, or history of self-harm.

Ms. Smart identified her case recording summaries describing her visits with Courtlynn at Wallace Group Home on January 25 and February 19. She documented Courtlynn's statements that she "really does not like her current placement," felt as though she was forced to move even after telling her therapist she needed more time, and was forced to read the letter about moving, which she did not write. Courtlynn also told her she was hearing voices and had not been comfortable enough to talk to anyone at Wallace "about her voices." Ms. Smart's note stated that she told Courtlynn to talk to her counselor "when her voices are loud," but she testified that she could not recall taking any other action in response to this conversation. Ms. Smart did not talk with Courtlynn again until three weeks later, when Courtlynn told her that she was struggling with an internal issue and had taken a Xanax that her classmate offered her "to help cope." She refused to tell Ms. Smart what the issue was. Ms. Smart's note stated that she mentioned to the counselor at Wallace that Courtlynn was "struggling with something" and requested that she "is just monitored." However, Ms. Smart did not recall contacting the school or Mother. Courtlynn jumped out the window four days later.

LaTangela Laing-Freeman, lead teacher at W.A. Bass Transition Program, also testified.[14] She was an administrator at the school and responsible for supervising the four teachers, handling enrollment of new students, and dealing with behavior issues. Ms. Freeman enrolled Courtlynn. She acknowledged that it was her responsibility to obtain educational records for new students at the school. Ms. Freeman testified that the only documents she received from Wallace Group Home for Courtlynn's enrollment meeting were the attachments to Ms. Thompson's email, which consisted of Courtlynn's report card and transcript, birth certificate, immunization record, social security card, and psychological evaluation. Ms. Freeman testified that she determined Courtlynn was "an ideal candidate" for the Transition Program based on those attachments, even though she never looked at her psychological evaluation. She said she "passed it" to the exceptional education teacher, Mr. Terry Sheridan, for him to review. When asked whether she needed to review all the documents, Ms. Freeman said, "Academically, we're just looking at the transcript, see if there's classes that we can give them for credit recovery." She explained that a student can only come to the program after failing classes, so the school would not take a student if he or she had not failed classes, but she could not recall any instance in which a student had been denied entry for non-academic reasons.

Ms. Freeman testified that Ms. Thompson did not provide her with any information indicating that Courtlynn had behavioral issues or would need a safety plan or behavior intervention plan. The application that was filled out during the intake meeting listed Ms. Thompson as Courtlynn's parent or guardian. It had a space marked to indicate that Courtlynn had an IEP, and the education passport did as well. However, Ms. Freeman

---

[14] We refer to this witness as Ms. Freeman, as she was addressed at trial.

testified that she typically does not discuss a student's IEP at the intake meeting aside from noting if the student has one and requesting a copy.[15] She said the details of an IEP are not discussed at an intake meeting.

Ms. Freeman testified that a student with an existing IEP must have a new one at W.A. Bass, which means the school must have a new IEP meeting. In other words, "when a student changes school, an IEP meeting has to be held." Ms. Freeman testified that an IEP meeting would bring the school's IEP team "up to date on everything" from Courtlynn's education to medical needs, psychological needs, and safety needs. She said that Courtlynn's parent and DCS caseworker would have been invited, and they would have discussed whether Courtlynn was under a safety plan or a behavior intervention plan with her previous IEP. Ms. Freeman was asked if she ever arranged an IEP meeting for Courtlynn, but she stated that scheduling an IEP meeting was the responsibility of the exceptional education teacher at W.A. Bass. Still, she admitted that it was *her* responsibility "to make sure the student enrolled in [the] program has an IEP in place and has an IEP meeting." She had no documentation of any effort to get a copy of the previous IEP or set up an IEP meeting between Courtlynn's enrollment on January 11 and her injury on February 23. Ms. Freeman conceded that when the school finally held an IEP meeting *after* Courtlynn's injury, it learned a great deal of information regarding her medical information, active diagnoses, list of medications, etc.

Mr. Sheridan, the exceptional education teacher for the Transition Program, testified as well. One of his duties was writing and implementing IEP plans. Mr. Sheridan testified that an IEP cannot be completed in a single day, and he described the various steps that must be taken. He testified that he will generally find out if a student already has an IEP, and if so, he will try to get a copy of the previous IEP and see if it is current. He testified that if it is current then he will generally follow the one in place, but if not, he will "have to do an IEP." Mr. Sheridan testified that he has to send out notice of an IEP meeting to the parent at least ten days before the meeting is held unless the parent waives the ten-day notice requirement. He explained that teachers make observations of the student in the meantime, so "they'll need a couple of days to do that." Mr. Sheridan testified that once he gathers all of the necessary information, he schedules the meeting at a time convenient for everyone, usually catering to what the parent wants. He testified that, during the meeting, everyone will go over the plan line by line to see if they agree, then they will "sign off" on the plan, and it will be finalized.

Mr. Sheridan testified that he was made aware that Courtlynn was "a special ed student" and had an IEP "within a week or so" after her enrollment, and he recalled "trying

---

[15] Ms. Freeman testified that there was some discussion about Ms. Thompson bringing a copy of Courtlynn's IEP to the school when she obtained it. She testified she could not simply obtain it from the EasyIEP system because Courtlynn was from another county and it had to be released. However, she admitted that she could have simply requested a copy of the IEP from Nicholas Hobbs Academy herself, rather than relying on Ms. Thompson to bring her a copy.

to get an IEP started or going, an IEP meeting going." Notably, when asked if he was waiting "to begin preparation for an IEP" until he obtained a copy of the previous IEP from Nicholas Hobbs Academy, Mr. Sheridan replied, "No. I could start that any time." He testified that he knew Courtlynn would need a new IEP because she was a special education student at a new school, so he "[s]tarted the process." Mr. Sheridan admitted that it is his responsibility "to schedule an IEP meeting within 30 days of a student's enrollment." However, he said that the 30-day rule is "a safe haven for us" and "no legal thing." Mr. Sheridan explained that "there's a 30-day grace window that we have that we try to use the rule of thumb to get the IEP done, if it's not current or if it needs to be in place." He admitted, however, that because students only attend the program on a short-term basis, he needs to schedule the meeting "as soon as possible." He also acknowledged that it is important to find out as soon as possible if a student needs a safety plan. Thus, Mr. Sheridan ultimately admitted that "the best practice would be to schedule an IEP meeting as soon as you learn of the need for an IEP." He agreed that he did not need to have all of the necessary documents in hand to schedule the meeting, and once he knows a student needs an IEP, "there's really nothing preventing you from scheduling the IEP meeting." Mr. Sheridan vaguely remembered talking about the 30-day rule of thumb in Courtlynn's situation and that the school had been closed for some snow days after she enrolled. Mr. Sheridan testified that he calculated the 30-day period as "30 school days," meaning he did not include weekends or snow days, but he did not know "if everybody else does that." He acknowledged that the process could be expedited if someone wanted to speed up the process. Mr. Sheridan identified the IEP he ultimately created for Courtlynn after her injury. It included information from various assessments of Courtlynn that were dated January 2018, so Mr. Sheridan conceded that the school had been evaluating Courtlynn in late January.[16]

Mr. Sheridan testified that he never received Courtlynn's psychological evaluation that was emailed to Ms. Freeman. However, he also stated, "I really don't look at these." He later said, "I've never looked at the psych eval information. Never." Mr. Sheridan testified that if he *had* read that Courtlynn's qualifying disability was "emotional disturbance," in her psychological evaluation or the previous IEP, it would have raised moderate concerns in his mind. He said that he would have wanted to find out "what else is going on" with this student, what behaviors she was exhibiting, or if she had her "buttons pushed in certain ways" so that the school was not giving her more reasons for the issue to manifest itself. Mr. Sheridan explained that an "emotional disturbance qualification" gives the school a sense that the student "may have a little bit more – something else going on

---

[16] Mr. Sheridan clarified that the assessments the school performed did not mean that she "qualifies for special ed services," and a psychologist would have to give her an assessment to say that she qualified. He explained that an "eligibility report" would say that Courtlynn was eligible and required an IEP, and if he had one of those for Courtlynn, then "at that point, she's in. She has to be in our special ed program to be getting services." Mr. Sheridan was then shown Courtlynn's enrollment email with the attached psychological evaluation showing that "she continues to qualify for special education services." Mr. Sheridan confirmed that this constituted Courtlynn's eligibility form.

that we're going to have to make sure we're paying attention to." He testified that the school would "dig deeper in the IEP to see what's going on" and what accommodations they needed to put in place and what services to give. Mr. Sheridan testified that if he had read some of the provisions of the previous IEP regarding Courtlynn's behavior, it would have set off a "siren" in his mind. The provisions regarding Courtlynn having a behavior intervention plan would have indicated to him that "something is going on with this student" and "[t]heir behavior is really, really disruptive in the learning environment." He would have also had moderate concerns about its provisions regarding her history of physical aggression. Mr. Sheridan testified that he had Courtlynn in one of his classes and she seemed like a "nice little girl," but, he admitted, "of course, you don't look emotionally disturbed. You can't really much look for that."

Upon further examination of the dates listed in Courtlynn's post-injury IEP, Mr. Sheridan agreed that he had completed all of the "requisites" he needed for her IEP during the month of January. When asked if he sent out the ten-day notice letter to schedule Courtlynn's IEP meeting at that point, Mr. Sheridan ultimately admitted that he did not. When asked if he still had not sent out a ten-day notice letter by the date of Courtlynn's fall, on February 23, Mr. Sheridan responded, "If it's not in our system, I don't – yeah." He then admitted that he "had from January 30th to February 23 . . . to get that IEP meeting set," and it was not even scheduled at the time of her injury. Mr. Sheridan admitted that it was his responsibility to schedule the IEP meeting within 30 days of enrollment. He conceded that he finally sent out the notice to schedule Courtlynn's IEP meeting "the Monday after she jumped out of the window," which was February 26, six weeks after she enrolled. At that point, he attempted to schedule an IEP meeting for "tomorrow," without any ten-day notice. When asked why he did not provide more advance notice, Mr. Sheridan testified that he was "trying to remember, . . . why did I do this so fast, so quickly." He then acknowledged the "urgency" of the situation after Courtlynn had jumped out the window. The IEP meeting was eventually held on March 7.

Finally, Mr. Sheridan testified that Courtlynn "did not have special education services in place" during her time at W.A. Bass, and there were "no accommodations" made for her in accordance with special education services. However, he stated that if he had known Courtlynn's "history," then things would have "[a]bsolutely" been different for her at W.A. Bass. He testified that it would have been helpful to know that she heard voices, had multiple personalities, attacked and threatened to kill staff members in the past few months, and historically had tried to go through a window. Mr. Sheridan testified that the school could have "fast-tracked" her IEP meeting if it had known this information. The trial court heard brief testimony from another special education teacher at W.A. Bass as well.

Another teacher, Lori Najafabadi, also testified. Ms. Najafabadi had established a special connection with Courtlynn in the short time that she attended W.A. Bass. Ms. Najafabadi, who was herself a parent of a special needs child, provided a table in her

classroom with pictures of things Courtlynn liked to color when she did not like going to her other classes or if Courtlynn got "stressed out" or needed to calm down. She explained that this provided an outlet or coping mechanism for Courtlynn. She said Courtlynn would "kind of vent" to her about not wanting to be at the group home. Ms. Najafabadi testified that she "knew [Courtlynn] had had some things that were going on in her head," but Courtlynn did not identify specific issues. Courtlynn had very briefly visited Ms. Najafabadi's classroom in the moments before she jumped out the window. After Courtlynn left the unattended science classroom, she briefly walked into Ms. Najafabadi's room and said that she was excited she had passed a drug test. Ms. Najafabadi told Courtlynn this was great but that she really needed to go back to her classroom, which Ms. Najafabadi did not know was unsupervised. She testified that there was a "thin line" between providing a "safe space" for Courtlynn in her classroom and making sure that she was not trying to get out of going to class. Courtlynn did not show any sign of distress and simply walked out of the room. Ms. Najafabadi then heard "a loud commotion" and looked out her doorway to see students in the science classroom looking out the window, and they told her Courtlynn had jumped.

Ms. Najafabadi testified that when she attended Courtlynn's IEP meeting after her injury, she was "extremely angry" and "flabbergasted" when she discovered Courtlynn's list of medical diagnoses and history of medical problems tied to behavioral issues. She testified that she never knew Courtlynn had a safety plan in place, had suicidal and homicidal ideations, or had a trigger of being told no, and she would have performed her job differently if she had known these facts.

The trial court also heard testimony from Stephanie Dahmer, an exceptional education coach at Metro Nashville Public Schools. She testified that she worked as an administrator for the EasyIEP application that was used at the time in public school districts in the State of Tennessee. When asked how much time a new school has to generate a new IEP, Ms. Dahmer testified that a new IEP is typically created within thirty days of a student's enrollment or when they have notice of a child having an IEP history. However, she was not certain if that was "just best practice" or something they had specified. She testified that a new school is able to create an IEP even without having an IEP from a previous school. Ms. Dahmer had reviewed Courtlynn's student history record in the EasyIEP system, and it showed that W.A. Bass did not request Courtlynn's IEP record until February 27, the week after her injury. On February 26, Mr. Sheridan had accessed Courtlynn's record, looked at documents, and created an invitation. Ms. Dahmer confirmed that Courtlynn's record had been available since her date of enrollment on January 11, and once it was requested on February 27, it was sent the same day.

On the fourth and final day of trial, the trial court heard testimony from Lori Morrow, who was a licensed clinical social worker and the "group home counselor" at Wallace Group Home. She was employed by Youth Villages and provided individual and family therapy to group home members. Ms. Morrow testified that all of the youth at

Wallace had mental health diagnoses and began school at W.A. Bass. She had access to Courtlynn's medical records in their system. She created a treatment plan for Courtlynn within 72 hours of her arrival, and Courtlynn also had a safety plan. Ms. Morrow provided individual therapy sessions for Courtlynn once per week and group sessions three times per week. She testified that she was aware of Courtlynn's *history* of hearing voices, but she did not know that Courtlynn was still hearing voices while at Wallace Group Home.[17] She testified that Ms. Smart never told her about her conversation with Courtlynn in which Courtlynn stated that she was hearing voices and did not feel comfortable talking to anyone at Wallace. Ms. Morrow also testified that she did not recall having any conversation with Ms. Smart about her second face-to-face visit with Courtlynn at Wallace, when Courtlynn stated that she was struggling with something. The only incident report that she recalled Courtlynn having while at the group home was that she had taken Xanax at school. Ms. Morrow said if she had known that Courtlynn was hearing voices, she would have "assessed that with her." Ms. Morrow went to see Courtlynn at the hospital after her injury, and Courtlynn said she had heard voices telling her to run away out the window of the school so she would not get caught.

Finally, the trial court heard testimony from Meredith Worsham, who was the team leader for DCS social services in Rutherford County at the time Courtlynn was in DCS custody. She supervised Cortney Smart, Courtlynn's caseworker. Ms. Worsham consulted with Ms. Smart on Courtlynn's case. She could not recall meeting Courtlynn face to face but had participated in various child and family team meetings regarding her. Ms. Worsham testified that Courtlynn was permitted to step down in levels of supervision, even though she was still experiencing auditory hallucinations, because the team was seeing progress in Courtlynn using her coping skills. She testified that it was never a goal or requirement for Courtlynn to totally eliminate the auditory hallucinations. She said "we were looking for progress for Courtlynn, not perfection." She testified that DCS considered Dr. Heston's report in making its decision to move Courtlynn. However, she conceded that Dr. Heston's report was never mentioned in the child and family team meeting summary, nor did she have any record to show that anyone at the meeting or any treating professional ever saw the report.

Ms. Worsham testified that the material compiled by DCS and sent to schools for enrollment typically does not contain any medical records of students in DCS custody. She noted that a student who took medication during the school day or had an inhaler might have medical records included, "[b]ut in general terms, sharing medical records with school staff and school districts is not DCS's practice." She said the same was true for mental health records and a child's social history. Ms. Worsham believed that providing those

---

[17] Ms. Morrow had never seen Dr. Heston's report before trial. She was not aware of Courtlynn's safety plan from juvenile court either. Ms. Morrow testified that she was also unaware that Courtlynn had multiple personalities. However, she acknowledged that Courtlynn's counselor at the Bartlett campus was also a Youth Villages employee, and her therapy notes would have been part of Courtlynn's electronic file with Youth Villages.

types of documents would violate DCS's confidentiality policies and/or HIPAA. Aside from compiling the education passport, she acknowledged that no one from DCS discussed Courtlynn's special education needs with anyone at Metro or provided Metro with any information regarding her suicidal ideations, self-harm, auditory hallucinations, or aggressive behavior. Ms. Worsham admitted that information regarding a peanut allergy would have been provided to the school (upon legal approval). She testified that Courtlynn's safety plan would not have been provided to the school either. The following exchange occurred when she was questioned about that issue:

> Q.     Is it the position of DCS in this lawsuit that it was not significant in the care and treatment and education of Courtlynn to make sure that all persons involved in her education and care were aware of her aggression that she had had in the past?
> A.     So our position is that information is confidential and not -- and it would not be shared with the school.

Ms. Worsham admitted, however, that no one consulted with DCS's legal team regarding what could be revealed to the school. She also admitted that Mother had signed every waiver presented to her in the past, and DCS never asked Mother or Courtlynn about providing information to the school or signing a release.

Eventually, Ms. Worsham conceded that, aside from her concerns about disclosing records, DCS caseworker Cortney Smart could have simply met with the school to inform it that some parameters had to be set up for Courtlynn, her IEP needed to be in place, and she needed special education services on day one, along with close support, weekly meetings, etc. However, Ms. Worsham was not aware of *any* follow-up by DCS to determine if Courtlynn had an IEP at her new school. She said that another child and family team meeting had been scheduled for March, at which time DCS would see how Courtlynn was doing with the transition. In the meantime, DCS had expected that Youth Villages would follow-up with Courtlynn.

The trial court entered findings of fact and conclusions of law in a 51-page order on June 11, 2024. At the outset, the order stated:

> Courtlynn Dodson ("Courtlynn") has experienced joy and goodness. She loves the music of Ed [Sheeran], is creative, and finds great pleasure in making art. She has had the love of an adoptive family for more than 20 years and connected with teachers with whom she developed strong bonds. Courtlynn has also suffered great tragedy. In her infancy, she suffered reprehensible abuse from those closest to her and those who should have loved her most. That abuse has resulted in a life filled with more hardship than anyone should bear. For reasons never to be known to the Court, Courtlynn's suffering led her to step out the second story window of W.A

- 28 -

Bass School, where she was an enrolled student, on February 23, 2018. As a result of this fall, Courtlynn is paralyzed from the waist down, has neither bladder nor bowel control, and will not recover. This Court is asked to determine whether the negligence of the State of Tennessee Department of Children Service[s] and/or the Metropolitan Nashville Public Schools caused Courtlynn's fall and paralysis.

The order stated that the court's decision was made following four days of live testimony and its review of the several volumes of exhibits entered in this matter.

The trial court included a detailed summary of the testimony of the witnesses.[18] After setting forth its very lengthy factual findings and the applicable law, the trial court set forth the following conclusions of law:

> 198. Initially, the Court notes a general sense of reluctance to testify, sense of defeat, and desensitization of the majority of the witnesses from the State and Metro in this matter. Why such a sense exists among government employees in this context is not clear to the Court. Does it come from exhaustion, working in a system without the necessary tools, and the sometimes tragic circumstances in which they work? The Court does not reach a conclusion in that regard; however, the witnesses['] demeanor makes it difficult to accept their testimony at face value.
>
> 199. By placing Courtlynn at Wallace Group Home, DCS knew or should have known that Courtlynn would have two education options[:] John Overton High School or W.A. Bass. Neither of these schools offered anything close to the supervision which Courtlynn had previously had and still needed. Nevertheless, DCS which makes all placement decisions for children in its custody took no affirmative steps to require additional assistance or monitoring from Courtlynn. Neither did DCS take the report of its own psychologist seriously, listen to the concerns of Courtlynn's mother or to Courtlynn herself. Unfortunately, Courtlynn just became another file for DCS and [as] a result no one listened.
>
> 200. Likewise, Metro accepted Courtlynn into a "credit recovery"

---

[18] Regarding Mr. Ballentine, Courtlynn's science teacher, the order states that he lied repeatedly during his deposition and again at trial. It further states:

> At the conclusion of Mr. Ballentine's testimony, the Court offered him the opportunity to correct his testimony because he had, at a minimum, misremembered the circumstances at issue. The undisputed video evidence makes this abundantly clear. A more skeptical Court could conclude that Mr. Ballentine had intentionally made false, material statements under oath to the Court. Under either scenario, Mr. Ballentine has demonstrated his testimony cannot be believed. Thus, the Court rejects all Mr. Ballentine's testimony and will not consider it in its decision.

program although there is no evidence that she was behind in credits. In fact, the only report card in the record, shows her on track for graduation. If Courtlynn was not behind on credits, then she should have gone to John Overton absent some other consideration. Metro was obligated to investigate why Courtlynn's guardian would want her to attend a program she did not need. Further Metro had an obligation to conduct an IEP for Courtlynn regardless of the circumstances that surrounded her attendance at W.A. Bass. Even a preliminary investigation in this regard, would have determined that, in fact, Courtlynn needed more assistance than W.A. Bass typically gave in its "credit recovery" program. She needed an IEP, she had a Safety Plan. Her teacher needed to teach, not roam the halls. She got virtually nothing from Metro.

201. Under the totality of circumstances, the Court finds that this injury to Courtlynn was reasonably foreseeable. A student attempting to run away from W.A. Bass is not so unusual and extraordinary to be unforeseeable. At Bass, where supervision of students is heightened to the level of four (4) to one (1), it is not so unusual or extraordinary that a student would break the rules when unsupervised to be unforeseeable. Courtlynn attempting to run away from school through an unlocked window in an unsupervised room was foreseeable.

202. It was further within the defendants' power to take action that more probably than not would have prevented the injury. Cho[ose] some other housing option. Lock the windows at W.A. Bass. Supervise the classroom. Have the IEP. Have a behavior intervention meeting. Share the Safety Plan. Provide the necessary information about her to the teachers. Follow the recommendations of Dr. Heston. Tell her counselor when she says she is "struggling" and "trying to cope" and taking "Xanax." As her custodian, do something when she cries for help.

203. Both Metro and DCS failed to meet their duty to Courtlynn. She suffered severe injuries. These injuries could have been prevented by simple steps, all of which were within the control of the defendants.

The trial court found no proof of any fault to be assessed against Mother or Courtlynn. It found Metro fifty percent at fault and the State fifty percent at fault for the injuries sustained by the plaintiffs. The order set forth compensatory damages of $402,348.02 for Courtlynn's medical expenses, $2.5 million for her pain and suffering, $4 million for permanent impairment and/or disfigurement, and $4 million for loss of enjoyment of life, for a total damage award of $10,902,348.02. The trial court assessed a judgment against Metro for $202,674.01 in favor of Mother for one-half of the medical expenses, and it assessed a judgment against the State for $202,674.01 for the other half of the medical expenses. Metro and the State were each assessed a proportional percentage of Courtlynn's non-economic damages in the sum of $5.25 million. However, pursuant to the GTLA, the trial court explained, the statutory cap of $300,000 required reduction of Courtlynn's

judgment against Metro to $97,325.99, taking into account the award of economic damages to Mother. Likewise, the statutory cap for the State of Tennessee was $300,000, the trial court explained, and Courtlynn's judgment against it was reduced to $97,325.99, taking into account the judgment for medical expenses. Thus, the total judgment awarded to the plaintiffs was $300,000 against each separate defendant for a total of $600,000. Metro timely filed a notice of appeal to this Court. The State did not appeal.

## II.  ISSUES PRESENTED

Metro presents the following issues for review on appeal:

1.     Did the Trial Court err by finding that Metro breached a duty of care that proximately cause[d] Plaintiff Courtlynn Dodson to jump out of a second-story window while unsupervised for a period of twenty-two seconds immediately preceding her fall?

2.     Did the Trial Court err by finding that school districts have a duty to second-guess the placement decisions of parents and guardians, despite medical providers' statutory duties of disclosure, federal and state law requirements to immediately enroll students in foster care in Tennessee schools, and the constitutional rights of parents and guardians to direct the education of their children?

3.     Did the Trial Court err by ruling that potential failure to provide a Free and Appropriate Education under the Individuals with Disability in Education Act should subject school districts to tort liability and does such a duty conflict with federal law by allowing remedies not permissible under that statute?

4.     Did the Trial Court err in its finding that this action was foreseeable to Metro even though Metro had no knowledge of the features of Courtlynn's psychological condition that could make such an action plausible, much less likely to occur?

The plaintiffs respond to Metro's issues but do not raise any additional issues of their own. The State has filed a brief on appeal in which it asserts that the evidence supports the trial court's findings that Metro breached its duty of care and that Metro's negligence was a proximate cause of Courtlynn's injury.

For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.

## III.  STANDARD OF REVIEW

In an appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Angela E.*, 303 S.W.3d

240, 246 (Tenn. 2010). Questions of law are reviewed de novo but with no presumption of correctness. *Eberbach v. Eberbach*, 535 S.W.3d 467, 473 (Tenn. 2017) (citing *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (2005)). "'Because the trial court is able to observe witnesses as they testify, appellate courts afford deference to the trial court's credibility assessments of live, in-court testimony.'" *Trentham v. Mid-Am. Apartments, LP*, 705 S.W.3d 151, 161-62 (Tenn. 2025) (quoting *Phillips v. Hatfield*, 624 S.W.3d 464, 474 (Tenn. 2021)).

## IV. DISCUSSION

### A. *Duty to Supervise*

The first issue presented on appeal by Metro is whether the trial court erred "by finding that Metro breached a duty of care that proximately cause[d] Plaintiff Courtlynn Dodson to jump out of a second-story window while unsupervised for a period of twenty-two seconds immediately preceding her fall." Although it was not entirely clear from the wording of the issue itself, Metro clarified in its reply brief that "[t]he issues Metro raises regarding duty relate to the *existence* of the duties imposed by the Trial Court's order." Metro argues that the duties the trial court relied on to impose liability against Metro "do not exist under Tennessee law," and the *existence* of a duty is a question of law for this Court to determine on appeal.

For plaintiffs to establish a negligence claim, they must prove the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019) (quoting *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009)). As Metro correctly notes, "[t]he issue of whether the School owed a duty to Plaintiff is a question of law to be decided by the court." *Haney v. Bradley Cnty. Bd. of Educ.*, 160 S.W.3d 886, 897 (Tenn. Ct. App. 2004) (citing *Lett v. Collis Foods, Inc.,* 60 S.W.3d 95, 99 (Tenn. Ct. App. 2001)).

Under Tennessee law, "schools, teachers, and administrators have a duty to exercise ordinary care for the safety of their students." *Haney*, 160 S.W.3d at 897 (citing *Snider v. Snider,* 855 S.W.2d 588, 590 (Tenn. Ct. App. 1993); *Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d 863, 870 (Tenn. Ct. App. 1985)). "What is considered 'ordinary care' is not a fixed standard and evolves over time along with the law under which it is defined. Like many other aspects of society, our nation's school systems have been forced to react to the changing times." *Id.* at 897. "Teachers and local school districts are not expected to be insurers of the safety of students while they are at school." *Roberts*, 692 S.W.2d at 870 (citing *Ankers v. Dist. Sch. Bd. of Pasco Cnty.*, 406 So.2d 72, 73 (Fla. App. 1981)). As a general matter, we have recognized that teachers are not "expected in every instance to supervise all the activities of all students at all times." *Id.* (citing *Sheehan v. St. Peter's*

- 32 -

*Catholic Sch.*, 188 N.W.2d 868, 870 (Minn. 1971)). However, our courts have also recognized that the "standard of care can be related directly to the nature of the persons to whom the duty is owed and the circumstances giving rise to the duty." *Id.* For instance, in a case involving the duty of care owed by school bus drivers to young students placed in their care, the Tennessee Supreme Court explained that reasonable and ordinary care "'under the circumstances . . . require[d] that the driver exercise special care proportionate to the age of the child and its ability, or lack of ability, to care for itself.'" *Id.* (quoting *Hawkins Cnty. v. Davis*, 391 S.W.2d 658, 660 (Tenn. 1965)). In *Roberts*, which involved a high school vocational teacher in shop class, we explained that the teacher had a "duty to take those precautions that any ordinarily reasonable and prudent person would take to protect his shop students from the unreasonable risk of injury," and the extent of those precautions "must be determined with reference to the age and inexperience of the students involved, their less than mature judgment with regard to their conduct, and the inherently dangerous nature of the power driven equipment available for their use in the shop." *Id.* at 870-71. So, "[t]he extent to which a teacher must supervise the activities of his or her students must be determined with reference to the age and inexperience of the students, their maturity, and the dangers to which they may be exposed." *King by King v. Kartanson*, 720 S.W.2d 65, 68 (Tenn. Ct. App. 1986) (citing *Townsley v. Yellow Cab Co.*, 237 S.W. 58 (Tenn. 1922)). "With specific reference to the conduct of teachers, we do not impose upon them the duty to anticipate or foresee the hundreds of *unexpected* student acts that occur daily in our public schools," but "we have no hesitation in holding a teacher or local school system to the duty of safeguarding students while at school from *reasonably foreseeable* dangerous conditions[.]" *Roberts*, 692 S.W.2d at 872 (emphasis added); *see Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 533 n.16 (Tenn. Ct. App. 2011).

On appeal, Metro argues that the trial court's decision "represents a radical departure from established Tennessee law on negligence and the responsibilities of school districts." Metro contends that the trial court's ruling essentially changes Tennessee law imposing a duty to exercise reasonable care and instead makes schools "insurers of student safety." Although Metro challenges three separate findings made by the trial court and argues that it recognized duties that do not exist under Tennessee law, this first issue addresses the trial court's findings regarding supervision. Metro argues that the trial court's decision will effectively require teachers to "have eyes on every student every second of the day." Citing several cases as examples, Metro contends that "public schools do not breach a duty of care when they leave students unattended for short periods of time during the school day." Thus, it argues that the trial court's decision constitutes "a drastic departure from Tennessee's long held reasonable and ordinary care standard for public school districts."

Metro first relies on this Court's decision in *Denson v. Benjamin*, No. 01A01-9810-CV-00571, 1999 WL 824346, at *1 (Tenn. Ct. App. Aug. 12, 1999), in which a ten-year-old middle school boy was tripped by a classmate on a stairwell between classes. His parents alleged negligent supervision by the school. *Id.* On appeal, we explained that

schools and teachers have a "duty to exercise ordinary care for the safety of students, a degree of care which has been defined as the care an ordinary prudent person would take *under the circumstances*." *Id.* at *3 (quotation omitted) (emphasis added). At this school, it was customary for homeroom teachers to stand outside their doorways between classes to monitor students in the hallway, and other teachers were generally posted around the hallway as well. *Id.* at *4. The plaintiffs argued on appeal that the school should have had someone on the stairwell too. *Id.* However, we found it "self-evident that teachers cannot be everywhere at once." *Id.* Moving a teacher from the hallway would have left a gap there. *Id.* Thus, we determined that the school could not be found negligent for not posting a teacher on the stairway. *Id.*; *see also Nickelson v. Sumner Cnty. Bd. of Educ.*, No. 01A01-9807-CV-00375, 1999 WL 767813, at *4 (Tenn. Ct. App. Sept. 29, 1999) ("Under Plaintiffs' theory, the teacher was required to continuously observe the seventh grade students as they came into her classroom and at all times they were therein. We do not agree that such a duty exists, because, taken to its logical conclusion, it would preclude a teacher from performing any task which required his or her attention elsewhere, e.g., individual conferences with students, reading from a text, or writing on the blackboard.").

Metro also cites this Court's decision in *King by King v. Kartanson*, 720 S.W.2d at 66, where plaintiffs alleged negligence by teachers for allowing a student to cross a street unsupervised, where he was struck by a vehicle. This Court examined "the duty with which school teachers must comply" as follows:

> The standard of care is that of reasonable and ordinary care under the circumstances. *Hawkins County v. Davis,* 216 Tenn. 262, 391 S.W.2d 658 (1965). This standard of care varies according to the nature of the persons to whom the duty is owed and the circumstances under which the parties find themselves. *Roberts v. Robertson County Board of Education,* 692 S.W.2d 863 (Tenn. App. 1985). The extent to which a teacher must supervise the activities of his or her students must be determined with reference to the age and inexperience of the students, their maturity, and the dangers to which they may be exposed. *Townsley v. Yellow Cab Company,* 145 Tenn. 91, 237 S.W. 58 (1922).
>
> Did the teachers in this case have a duty to conduct their students back across the street to the park after they had finished eating lunch? According to the proof, the plaintiff was a well-coordinated youngster, thirteen years old, alert and not absent-minded, had no hearing or vision problems, and was a dependable young man, mature for his age. He knew to look both ways before crossing a street. There is nothing in the record to suggest that he required any special help in crossing the street or that his normal propensities made him reckless or disdainful of danger.
>
> Twenty-seventh Avenue North, at the location where the accident happened, is not a main thoroughfare. It runs approximately a block between the McDonald's restaurant and Centennial Park and then enters the park.

- 34 -

Vehicular traffic can enter the street from the west at two points north of the restaurant, but the street is certainly not a busy, heavily traveled artery. The situation the plaintiff found himself in did not present any unusual dangers or unreasonable risks.

In *Gholston v. Richards,* 179 Tenn. 645, 169 S.W.2d 846 (1943), an eleven-year-old student was struck when crossing the street after alighting from a school bus. The Supreme Court found the bus driver to be free of negligence saying, "He could not be expected to escort her over the road. She was an intelligent child, eleven years of age, and she testified that she had been riding this bus and getting off at this place for two years and that she knew she had to be cautious and look both ways before crossing the highway."

In another school bus-passenger case the bus driver was held to be negligent in allowing a six-year-old to alight without notice or warning that a truck was approaching from the front when the driver knew that the route of the child would take her around the rear of the bus and into the path of the truck. *Cartwright v. Graves,* 182 Tenn. 114, 184 S.W.2d 373 (1944). The court distinguished this case from *Gholston* on the basis of the ages of the children and the knowledge of the driver of the impending danger. The "dominant factor," however, was the age of the child and his or her consequent ability or lack of ability to look after his or her own safety.

We find nothing in the record to suggest that the plaintiff would not use ordinary care for his own safety, or that 27th Avenue North was a street which was unreasonably dangerous to cross. Therefore, we do not believe that the teachers in this case had a duty to personally escort the students across the parking lot from McDonald's (which was probably more heavily traveled than the street itself) and then across 27th Avenue to the park. If there was no duty then the inquiry ends. *Roberts v. Robertson County Board of Education,* 692 S.W.2d 863 (Tenn. App. 1985).

*Id.* at 68-69.

Given these and other decisions, Metro insists that it "did not breach a duty of supervision in this case" by "leaving a student unsupervised for a period of twenty-two seconds." Metro argues that "a teacher's absence from a classroom of high school students for a few minutes is not negligence." However, Metro fails to recognize that the level of supervision required of school teachers under the standard of ordinary care varies with the circumstances of each case. *Santiago v. Cooper*, No. W2003-01882-COA-R3-CV, 2004 WL 1159644, at *4 (Tenn. Ct. App. May 18, 2004); *Ferguson v. Metro. Gov't of Nashville*, No. 01-A-01-9211-CV00434, 1993 WL 115661, at *4 (Tenn. Ct. App. Apr. 16, 1993). "[S]chool teachers must exercise reasonable and ordinary care *under the circumstances* to ensure the safety of their students." *Wherry v. Obion Cnty. Bd. of Educ.*, No. W2024-00693-COA-R3-CV, 2025 WL 1219032, at *5 (Tenn. Ct. App. Apr. 28, 2025) (emphasis

- 35 -

added).[19]

Keeping in mind that "[t]he amount of supervision a teacher is required to exercise is based on the age and experience of the students, their maturity level, and the dangers of a particular situation," *Crockett v. Sumner Cnty. Bd. of Educ.*, No. M2015-02227-COA-R3-CV, 2016 WL 6995483, at *7 (Tenn. Ct. App. Nov. 30, 2016), we reject Metro's arguments regarding the nonexistence of a duty of supervision under the circumstances of this case. To begin, we find it disingenuous for Metro to represent that Courtlynn was only left unsupervised for a period of twenty-two seconds, which it calculates from the time Courtlynn walked out of the classroom of Ms. Najafabadi until she jumped out the window. Metro admits that "Mr. Ballentine was absent from his classroom for a period of approximately ten minutes." Regarding supervision, the trial court found that the principal at W.A. Bass "expected his teachers to be with their students during their class period." The court found that it was not uncommon for students in this program to have behavioral or mental health issues. It found that students at the school had threatened to kill each other, tried to run away from school, exchanged illegal drugs at school, come directly from incarceration, and engaged in fights, and because of such behavior, "heightened supervision is required by the teachers to curb such bad conduct." The court noted that "[t]hese are not typical high school students." The trial court noted the principal's testimony that "[j]ust the presence of a supervisor (teacher) in the classroom is a deterrent to poor behavioral decisions." The court also found that the school knew Courtlynn was a special education student. It found that the window in the science classroom was "unlocked, easily accessible to the students, and big enough to step out of." The court noted Mr. Ballentine's belief that it was "crazy" to have an unlocked window in a second-floor classroom with a group of students requiring a 4:1 supervision ratio. Nevertheless, the trial court found, Mr. Ballentine "left this group of students unsupervised for ten (10) minutes in a second-floor room he knew had an unlocked window big enough to walk out of." The court found that several students wandered in and out of Mr. Ballentine's classroom during the time it was unsupervised, including Courtlynn. It found that "Courtlynn went back to Ballentine's room, and without him there to supervise, deter or attempt to stop her, she opened the window and walked out in an attempt to run away." The court found that a student attempting to run away from W.A. Bass was not so unusual

[19] *See, e.g.*, *Wingo v. Sumner Cnty. Bd. of Educ.*, No. 01-A-01-9411-CV-0051, 1995 WL 241327, at *1-3 (Tenn. Ct. App. Apr. 26, 1995) ("[The teacher] chose five students from the many willing applicants. Each of the selected volunteers was a member of the senior class, seventeen or eighteen years of age, strong and in good health. Several of them . . . held jobs outside of school that required unsupervised heavy lifting. Given the maturity and capability of these young men, it was not negligent for [the teacher] to allow them to go to the old school unaccompanied[.]"); *Ferguson*, 1993 WL 115661, at *4 ("There is no evidence that it is negligent for a school board to fail to supply more than one supervisor to take seven pre-kindergarten boys to the restroom, or for a teacher to attempt the task without help."); *McCann v. Coleman*, No. CA 45, 1990 WL 97860, at *3 (Tenn. Ct. App. July 17, 1990) (considering that the injured student "was a normal, healthy, 15-year-old young man" who did farm work, played sports, had run the same type of race before without incident, and "had no handicaps which would make this type of activity inappropriate for him").

or extraordinary to be unforeseeable, and neither was a student breaking the rules when unsupervised. The trial court specifically recognized that schools and teachers "have a duty to exercise ordinary care for the safety of students," meaning "the care an ordinary prudent person would take under the circumstances," and the amount of supervision required depends on "the age and experience of the students, their maturity level, and the dangers of the particular situation." The trial court found that Metro failed to meet its duty to Courtlynn, as she "got virtually nothing from Metro." As the trial court put it, "Lock the windows at W.A. Bass. Supervise the classroom."

The trial court's decision does not represent a radical departure from Tennessee caselaw. In *Phillips ex rel. Gentry v. Robertson County Board of Education*, No. M2012-00401-COA-R3-CV, 2012 WL 3984637, at *1 (Tenn. Ct. App. Sept. 11, 2012), we considered a county's liability for injuries sustained by a student who had Asperger's syndrome in an altercation with another student. The injured student, Jacob, was in seventh grade but had "'meltdowns' when he cried inconsolably and needed to go to a quiet place to compose himself." *Id.* Test results revealed that Jacob did not meet state special education guidelines for any disability, but he qualified for the program for gifted students. *Id.* Still, his "social language skills" were a weakness. *Id.* The school held a support team meeting and implemented modifications to assist him, "including preferential seating and a card system to give him a way of signaling to a teacher that he was being bullied or felt stressed." *Id.* Jacob's psychologist advised the school that students like him are often teased and bullied. *Id.* Jacob and his mother reported numerous instances of teasing and bullying, although school officials denied observing teasing or bullying and asserted that the problems were a function of Jacob's inability to interact appropriately with peers. *Id.* at *2. Late in the school year, there was a physical altercation between Jacob and a classmate, which resulted in a serious eye injury leaving Jacob legally blind in one eye. *Id.* at *1. The school system had a policy that students be under the supervision of school personnel at all times of the school day; however, the teacher in the classroom had left the room due to an emergency when the altercation occurred. *Id.* at *1-2. The teacher had heard about Jacob's diagnosis informally but did not recall being officially advised of any issues, and the only accommodation of which she was aware was preferential seating. *Id.* at *2. The trial court determined that the school was negligent and entered a judgment against the county for $300,000. *Id.* at *3. The trial court found that the teacher was negligent in failing to follow the school policy and instructions of the principal with regard to leaving students in the classroom unattended. *Id.* at *6. It also found that the principal and school officials were negligent in failing to properly advise the teacher about Jacob's condition and failing to follow through with regard to the accommodations. *Id.*

On appeal, the County argued that "its actions were not negligent--i.e., that the school did not breach the duty of care owed to Jacob." *Id.* With respect to the teacher leaving the classroom unattended, the County argued on appeal that "leaving a class of seventh graders unsupervised for five minutes is not negligent." *Id.* However, under the particular circumstances of that case, we disagreed. *Id.* The school policy provided that

teachers were not to leave children unsupervised and were to ask a teacher to watch the class if they had to leave. *Id.* In addition, the principal acknowledged that this particular student should not have been left in a room without a teacher present given his "condition" and his complaints about bullying. *Id.* "In light of what the school system knew about Jacob and his complaints," the evidence supported the trial court's conclusion that the teacher "was negligent when she left him unsupervised in a classroom with a group of middle school students lined up for dismissal." *Id. See also* Lynn M. Daggett, J.D., Ph.D. (Education), *Reasonable Supervision of Special Students: The Impact of Disability on School Liability for Student Injury*, 43 J.L. & Educ. 303, 316 (2014) ("Courts do not hold schools to a higher standard than 'reasonableness' in supervising special education students. However, 'reasonable' supervision of a special education student may involve more and different action than 'reasonable' supervision of a student without a disability.").

Thus, we reject Metro's argument on appeal that the trial court's decision constitutes "a drastic departure from Tennessee's long held reasonable and ordinary care standard for public school districts." We also reject its arguments regarding the nonexistence of a duty of supervision. Like the trial court, we conclude that a duty to supervise Courtlynn existed under the circumstances of this case.

## B. Duties related to the IEP

Next, we will address Metro's various arguments regarding its duties with respect to Courtlynn's IEP. Metro's arguments regarding the IEP are numerous and a bit difficult to follow, but it frames its issue on appeal as follows:

> The Trial Court held that Metro breached a duty of care by failing to schedule an Individualized Education Plan meeting and obtain certain special education documents in the five weeks between Courtlynn Dodson's enrollment in the Transitions program and her fall. Did the Trial Court err by ruling that potential failure to provide a Free and Appropriate Education under the Individuals with Disability in Education Act should subject school districts to tort liability and does such a duty conflict with federal law by allowing remedies not permissible under that statute?

Within the argument section of its brief, Metro raises several different arguments regarding the IEP, which we will address in turn.

First, Metro argues that "[w]hile there was testimony regarding the need to hold an IEP meeting within thirty days of enrollment, the Trial Court did not identify any federal or state law requiring that an IEP be updated within thirty days of a school transfer," so "at most, this timeline is an internal Metro policy or practice." Relying on 20 U.S.C.A. § 1414, Metro argues that "[t]he IDEA requires that IEPs be updated annually." Metro insists that the thirty-day rule was a mere internal policy that does not establish the duty of care, so

"Metro's duty to hold an IEP meeting within thirty days of Courtlynn's enrollment at W.A. Bass was irrelevant to its general duty of care for Courtlynn."

Metro's initial argument, as we perceive it, is that the trial court should have relied on 20 U.S.C.A. § 1414. Metro quotes the following section of 20 U.S.C.A. § 1414(d)(4)(A)(i): "The local educational agency shall ensure that, subject to subparagraph (B), the IEP Team . . . reviews the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved[.]" However, the same statute also provides:

> **(d) Individualized education programs**
> . . .
> **(2) Requirement that program be in effect**
> **(A) In general**
> At the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program, as defined in paragraph (1)(A).
> . . .
> **(C) Program for children who transfer school districts**
> **(i) In general**
> **(I) Transfer within the same State**
> In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law.
> . . .
> **(ii) Transmittal of records**
> To facilitate the transition for a child described in clause (i)--
> **(I)** the new school in which the child enrolls shall take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous school in which the child was enrolled, pursuant to section 99.31(a)(2) of title 34, Code of Federal Regulations; and
> **(II)** the previous school in which the child was enrolled shall take reasonable steps to promptly respond to such request from the new school.

20 U.S.C.A. § 1414(d)(2). Therefore, we reject Metro's apparent suggestion on appeal that

it only had a *statutory* obligation to update the IEP annually.

Metro also argues, with respect to its internal thirty-day rule, that "[i]nternal school policies do not establish the duty of care[.]" However, Metro does not cite to any portion of the trial court's 51-page order to demonstrate that the court relied on Metro's internal thirty-day rule to somehow "establish the duty of care." With respect to this issue, Metro's brief simply states, "The Trial Court held that 'Metro had an obligation to conduct an IEP for Courtlynn regardless of the circumstances that surrounded her attendance at W.A. Bass.'" This finding by the trial court does not even mention the thirty-day rule or impose any duty in connection with it. Thus, we discern no merit in Metro's argument regarding this issue.

Next, Metro argues that an IEP is an educational document that is not required to include safety information, as not every child with an IEP is a safety risk. Metro contends that "the general purpose of an IEP team meeting is not to discuss a child's safety." As such, Metro suggests it is improper to "correlate the two." Considering that no behavioral or mental health concerns were raised during Courtlynn's intake meeting and that she had no behavior issues while at school, Metro argues that it "had no notice that holding an IEP meeting would be a necessary step for keeping Courtlynn safe from self-harm at school or elopement." Thus, Metro contends that any duty it had to hold an IEP meeting "was irrelevant" to whether it had a duty to prevent Courtlynn from jumping out a window.

The record before us simply does not support Metro's suggestion that there was no correlation between Courtlynn's IEP and her safety. The trial court recounted the testimony of the school principal, as an educator for 25 years, that having an IEP meeting is "an important tool" to determine if a student needs a safety plan. The court described Ms. Freeman's testimony that an IEP meeting would have involved discussion of not only academics but also whether Courtlynn was under a safety plan or behavior intervention plan, and it would give the team the opportunity to be "brought up-to-date on all of Courtlynn's needs," from psychological to medical to safety. The court found that Courtlynn had always had an IEP and that Mother participated in the meetings. It noted the testimony of Mr. Sheridan, the exceptional education teacher, that he knew Courtlynn was a special education student and needed an IEP. It also noted his admission that the best practice is to schedule an IEP meeting as soon as a teacher learns of the need for an IEP, and with knowledge that a student has a prior IEP, there is nothing to prevent the scheduling of a meeting. The court found that "Metro had an obligation to conduct an IEP for Courtlynn," and "[e]ven a preliminary investigation in this regard" would have revealed that she needed more assistance than W.A. Bass typically gave in its Transition Program. It noted that Courtlynn's previous IEP at Nicholas Hobbs Academy, which was easily obtainable, stated that her primary disability was emotional disturbance, that she had a behavior intervention plan, and that her behavior impeded her learning or that of others. The court found that Metro attempted to "use the excuse of snow days" for its failure to provide an IEP meeting when Ms. Freeman readily admitted that those few days really did

not matter because it was her job to make sure an enrolled student had an IEP meeting and an IEP in place. The trial court noted that Ms. Freeman could produce no evidence to show that the school exercised due diligence in attempting to set up an IEP meeting or even obtain the existing IEP until after the injury. It found that Mr. Sheridan sent out a notice at that point "[i]n the chaos of trying to cover up its failures for Courtlynn." The trial court found that the post-injury IEP meeting revealed information regarding Courtlynn's active diagnoses and medications, but "[b]y then, it was too late." In summary, the trial court found:

> Obviously, Metro had the ability to promptly obtain Courtlynn's records and IEP, and even schedule a new IEP meeting, but it just did not take the time to do it. Just following the procedures available to the school would have set in place an IEP meeting which would have given Bass an opportunity to educate itself about Courtlynn. And, more probably than not, averted this tragedy.

The records fully supports the trial court's findings.

This Court considered a similar argument regarding an IEP in *Phillips ex rel. Gentry v. Robertson County Board of Education*, 2012 WL 3984637, at *1, which, as previously discussed, involved Jacob, the seventh grader with Asperger's syndrome who was in a physical altercation while his teacher was out of the room. His mother had requested that an IEP be developed, and the school held a support team meeting and implemented modifications. *Id.* However, his teacher did not recall reviewing his IEP or being officially advised of any issues involving him, and the only accommodation she recalled was his preferential seating. *Id.* at *2. The trial court found that the teacher "did not review Jacob's IEP, was not made aware of Jacob's special needs and circumstances by school officials, [and] was never shown any of the information contained in [his psychologist's] initial evaluation or April letter[.]" *Id.* at *3. It found that the "failure of the other school officials to appropriately [disseminate] information concerning Jacob to those needing to know was also negligence." *Id.* The trial court found that if the teacher had known of the issues involving this student, "she may have made extra effort to be certain that the classroom was supervised by someone during her absence or sent Jacob out of the classroom as she left." *Id.* On appeal, the County made an argument similar to Metro's regarding the purpose of the IEP process:

> As to the second ground for negligence (failure to disseminate information), the County argues that the IEP process "was not designed to serve the purpose of addressing issues like autism, Asperger's, or social problems." The salient point, however, is that the school system failed to disseminate, *through the IEP process or otherwise*, important information about Jacob's Asperger's and his problems with bullying. [His teacher] started in the middle of the year. She testified that, through informal

- 41 -

conversations with other teachers, she learned that Jacob had been diagnosed with Asperger's and that he was allowed to have preferential seating. According to [her] testimony, she was not given individualized information about the nature of Jacob's Asperger's diagnosis, how the condition affected him, or what might trigger symptoms. She was not aware of the information in the psychologist's letter, sent in April 2006, that children with Asperger's were often teased and bullied. She was not aware of any other accommodations (other than preferential seating) applicable to Jacob. Furthermore, [the teacher] was not advised that Jacob and his mother had complained of bullying by W.K. [The teacher] testified that, had she known about Jacob's limitations, she would have been much more likely to make sure someone was watching her classroom.

> The evidence does not preponderate against the trial court's finding that the school system was negligent in failing to properly advise [the teacher] about Jacob's condition. *See generally Small v. Shelby Cnty. Sch.,* No. W2007-00045-COA-R3-CV, 2008 WL 360925 (Tenn. Ct. App. Feb. 12, 2008) (asthmatic student injured in physical education class; jury found school system liable for failing to disseminate information about student's medical problems to teachers).

*Id.* at *7 (emphasis added). Thus, the case involved not only "a failure of supervision" but also a failure of "dissemination of information." *Id.* There were comparable failures in this case.

Metro argues on appeal that *Phillips* is distinguishable because, in that case, "the school had *direct knowledge* of the student's 'developmental limitations,' which were relevant to the resulting injury." (emphasis added). Metro argues that because Jacob's IEP "discussed his issues" and provided accommodations, "the school was on notice that the plaintiff could be bullied and should not be left unsupervised." Metro argues "[t]hat is not remotely similar to the facts here." Metro contends that nothing in Courtlynn's existing IEP indicated she was "a safety risk." It claims that the trial court's ruling "seems to be premised on the idea that a review of special education documents would have alerted Metro to the fact that Courtlynn would be likely to jump out of a second-story window," when there is "no evidence to support that conclusion." Metro argues that "the Trial Court erred to the extent it found that Metro's failure to obtain the IEP was a breach of a legal duty of care."

Metro's argument focuses too narrowly on what it knew, rather than what it should have known. *See K.G.R. v. Union City Sch. Dist.*, No. W2016-01056-COA-R9-CV, 2016 WL 7230385, at *4 (Tenn. Ct. App. Dec. 14, 2016) ("The pertinent question is whether there was any showing from which it can be said that the defendants reasonably knew or should have known of the probability of an occurrence such as the one which caused the plaintiff's injuries."). Metro also focuses on isolated provisions of certain documents

rather than the overall picture regarding the information it should have known or obtained about Courtlynn. W.A. Bass Learning Center knew that Courtlynn was a special education student from Wallace Group Home. Her psychological evaluation, which confirmed that she continued to qualify for special education services due to emotional disturbance, was emailed to the school prior to enrollment. Inexplicably, no one at the school ever read it. The school principal testified that it was protocol at the school for a behavioral intervention meeting to occur at the time of enrollment or soon after, which would involve a discussion of any behavioral issues the student might have. He admitted such a meeting never occurred regarding Courtlynn, and this was an opportunity the school "just missed." There also should have been a separate and distinct IEP meeting for Courtlynn, where the school's team of educators and likely her parent and/or DCS would have discussed not only educational issues but also her safety and behavior. The school had not even sent out a ten-day notice to schedule it at the time of her injury. Even though W.A. Bass knew that Courtlynn had an IEP at her previous school, Nicholas Hobbs Academy, no one requested a copy of it from the school. W.A. Bass knew Courtlynn was a special education student, but she had no special education services in place while at the school. The record fully supports the trial court's finding that Courtlynn "got virtually nothing from Metro." Of course, Metro learned all about Courtlynn during the IEP meeting held after her injury, but by then, it was too late. Metro failed to obtain and disseminate available information about Courtlynn through the IEP process *or otherwise.* Its arguments regarding its lack of notice are unconvincing.

Metro's next argument regarding the IEP is based on this Court's decision in *Sabaski v. Wilson County Board of Education*, No. M2010-00872-COA-R3-CV, 2010 WL 5289798 (Tenn. Ct. App. Dec. 17, 2010). It is helpful to first review the facts and holding of that case in order to fully understand Metro's argument. In *Sabaski*, parents of a student filed suit against the county board of education and its employees, alleging that the school developed an IEP for their student but coerced them into agreeing to it despite concerns and failed to carry out its requirements. *Id.* at *1. They alleged that their child was placed in a classroom for students with behavioral problems rather than "in a fragile classroom as provided in the IEP," which led to their student being subjected to physical force, an altercation, and an eventual arrest. *Id.* Notably, the parents' complaint alleged three causes of action: assault and battery; false imprisonment; and negligent failure to train its employees in how to handle students with the type of disability at issue. *Id.* They sought damages for the cost of homeschooling the child as well as damages for emotional distress caused by the alleged assault and false imprisonment, aggravation of her disability, etc. *Id.* at *2. The trial court granted the defendants' motion to dismiss based on their failure to exhaust their administrative remedies regarding the IEP pursuant to the Individuals with Disabilities Education Act ("IDEA"). *Id.*

On appeal, we began by examining the IDEA, its history, and scope. *Id.* We explained:

One of Congress's purposes in enacting the IDEA was "to ensure that all children with disabilities have available to them a free appropriate public education" ("FAPE"). 20 U.S.C. § 1400(d). The primary statutory mechanism for assuring that a disabled child receives a FAPE is the development of an IEP, which contains an individualized instruction plan for that child. 20 U.S.C. §§ 1401(14), 1414(d). Under the IDEA, states may receive federal funding if they meet certain requirements, including the establishment of procedural safeguards designed to give a parent notice and the opportunity to be heard when the parent believes his or her child has been denied rights secured by the IDEA. 20 U.S.C. §§ 1412, 1415. Only parties aggrieved by the decision made during the administrative process may bring a civil action under the IDEA. 20 U.S.C. § 1415(i)(2). A plaintiff must exhaust his or her administrative remedies before bringing suit under the IDEA in federal or state court. *See Crocker v. Tenn. Secondary Sch. Athletic Ass'n,* 873 F.2d 933, 936 (6th Cir.1989).

*Id.* We explained that "the IDEA's exhaustion requirement does not apply to the plaintiffs' state law claims." *Id.* at *1, *3. Therefore, we determined that the defendants' reliance on the exhaustion requirement was misplaced. *Id.* at *3.

However, we also explained that Tennessee caselaw had interpreted United States Supreme Court precedent "as barring state law claims *for denial of a child's right to a FAPE* because 'the IDEA provides the exclusive remedy for a child denied the right to a public special education." *Id.* at *4 (quoting *Rogers v. Memphis City Schs.*, No. 02A01-9604-CV-00066, 1997 WL 675194, at *3 (Tenn. Ct. App. Oct. 29, 1997)) (emphasis added). Thus, the remaining issue before the Court in *Sabaski* was "whether the state law claims asserted by the plaintiffs [were] essentially *based upon the state's failure to provide a FAPE.*" *Id.* We considered the following explanation by a federal court that had compared the IDEA with actions for tort-like damages:

The touchstone of a traditional tort-like remedy is redress for a broad range of harms "associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages." *United States v. Burke,* 504 U.S. 229, 239, 112 S.Ct. 1867, 1873, 119 L.Ed.2d 34 (1992) (interpreting Title VII). By contrast, the touchstone of IDEA is the actual provision of a free appropriate public education.

*Id.* at *5 (quoting *Sellers v. Sch. Bd. of the City of Manassas*, 141 F.3d 524, 525 (4th Cir.1998)).

We ultimately concluded that the trial court erred in dismissing the plaintiffs' claims for assault and battery and false imprisonment:

> With respect to the plaintiffs' claims for assault and battery and false imprisonment, which are intentional torts, we do not consider the IDEA preclusive. The claims are not brought under laws designed to protect a disabled child's right to a FAPE, and they seek monetary damages to compensate the plaintiffs for past injuries to their child. The IDEA does not authorize monetary damages. *See Crocker,* 980 F.2d at 386. If [the plaintiffs' child] were not a disabled child entitled to services under the IDEA, her parents would not be precluded from bringing actions for these intentional torts.

*Id.* "By contrast," we concluded that "the plaintiffs' claim against the board of education for failure to properly train its employees in handling children with disabilities like [their child's] is precluded by the IDEA." *Id.* at *6. "The plaintiffs' allegations regarding the school system's failure to provide adequate services relate[d] directly to its obligations under the IDEA," and the plaintiffs were "essentially seeking to collect monetary damages for violations of the IDEA." *Id.* We concluded that this negligence count failed to state a claim under the GTLA "[b]ecause the IDEA is the exclusive remedy *for the failure to provide a FAPE*." *Id.* (emphasis added).

Citing only the portion of *Sabaski* regarding the precluded negligence claim, and a quote from *Sellers*, Metro argues, "Plaintiffs have not brought a claim under the IDEA related to the timing of Courtlynn's IEP meeting. This Court has already ruled that a school's failure to provide a free and appropriate education under the IDEA is not actionable under the GTLA[.]" Metro argues that the trial court's ruling "was error because it is wholly related to Metro's responsibilities under the IDEA, and the sole remedies for violations of that act are available under the act." According to Metro, this Court has held that "violations of federal special education law are not grounds for liability under the GTLA," "plaintiffs cannot recover for claims of educational malpractice under the GTLA," and "a school's duties under the IDEA do not subject it to liability under the GTLA." Metro summarizes its position as follows: "In short, any responsibilities related to Courtlynn's IEP or the holding of an IEP meeting sound in education. While those duties are enforceable under the confines of the IDEA, the Trial Court erred by finding that the Plaintiffs' GTLA claim was an appropriate vehicle for litigating this issue." We conclude that Metro's reliance on *Sabaski* is misplaced.

The fact that the plaintiffs' negligence claim arose in an educational setting and is somehow related to Metro's responsibilities under the IDEA does not mean that the sole remedy available to the plaintiff is under the IDEA. Metro fails to recognize the "contrast" between the different types of claims that were asserted in *Sabaski*. *See id.* at *6. We explained that the negligence claim against the board of education "for failure to properly train its employees in handling children with disabilities" was precluded by the IDEA, as the "allegations regarding the school system's failure to provide adequate services relate[d] directly to its obligations under the IDEA," and the plaintiffs were "essentially seeking to

- 45 -

collect monetary damages for violations of the IDEA." *Id.* Such a count failed to state a claim under the GTLA "[b]ecause the IDEA is the exclusive remedy for the failure to provide a FAPE." *Id.* Here, however, Courtlynn and Mother do not assert a claim for denial of a child's right to a FAPE or essentially seek to collect monetary damages for violations of the IDEA. Metro even admits in its reply brief, "the Complaint does not allege that Metro failed to provide Courtlynn with exceptional education services, and there are no claims that Courtlynn was denied a free and appropriate education in violation of the IDEA." The plaintiffs' claim here is like the tort claims the *Sabaski* Court held should not have been dismissed. "The claims are not brought under laws designed to protect a disabled child's right to a FAPE, and they seek monetary damages to compensate the plaintiffs for past injuries to their child." *Id.* at *5. The plaintiffs here do not assert what is essentially a claim for educational malpractice, as Metro suggests. *Sabaski* does not entitle Metro to relief on appeal.

## C. Duty to Investigate Enrollment Decision

Metro raises an additional issue regarding whether the trial court erred "by finding that school districts have a duty to second-guess the placement decisions of parents and guardians, despite medical providers' statutory duties of disclosure, federal and state law requirements to immediately enroll students in foster care in Tennessee schools, and the constitutional rights of parents and guardians to direct the education of their children." For its argument regarding this issue, Metro challenges a single sentence within the trial court's order, which we will set forth in context and italicize below:

> 199. By placing Courtlynn at Wallace Group Home, DCS knew or should have known that Courtlynn would have two education options John Overton High School or W.A. Bass. Neither of these schools offered any thing close to the supervision which Courtlynn had previously had and still needed. Nevertheless, DCS which makes all placement decisions for children in its custody took no affirmative steps to require additional assistance or monitoring from Courtlynn. Neither did DCS take the report of its own psychologist seriously, listen to the concerns of Courtlynn's mother or to Courtlynn herself. Unfortunately, Courtlynn just became another file for DCS and [as] a result no one listened.
>
> 200. Likewise, Metro accepted Courtlynn into a "credit recovery" program although there is no evidence that she was behind in credits. In fact, the only report card in the record, shows her on track for graduation. If Courtlynn was not behind on credits, then she should have gone to John Overton absent some other consideration. *Metro was obligated to investigate why Courtlynn's guardian would want her to attend a program she did not need.* Further Metro had an obligation to conduct an IEP for Courtlynn regardless of the circumstances that surrounded her attendance at W.A. Bass. Even a preliminary investigation in this regard, would have determined that,

in fact, Courtlynn needed more assistance than W.A. Bass typically gave in its "credit recovery" program. She needed an IEP, she had a Safety Plan. Her teacher needed to teach, not roam the halls. She got virtually nothing from Metro.

(emphasis added). Metro argues on appeal that an obligation to investigate the enrollment decision "was not a breach of duty pled by any of the parties before or after trial," and therefore, "Metro had no opportunity to assert a defense on this issue[.]" Metro argues, "To the extent the Trial Court relied on this obligation to find Metro breached a duty of care, the Trial Court made an error of law." Metro cites various statutes on appeal in an effort to argue that school districts do not have any duty to investigate or second guess enrollment decisions of parents and guardians.

We agree that this issue was not pled or argued before the trial court. However, Metro challenges a single sentence within a 51-page order. The trial court did state that "Metro was obligated to investigate why Courtlynn's guardian would want her to attend a program she did not need." Notably, however, the very next sentences of the order state, "Further Metro had an obligation to conduct an IEP for Courtlynn *regardless of the circumstances that surrounded her attendance at W.A. Bass*. Even a preliminary investigation in this regard, would have determined that, in fact, Courtlynn needed more assistance than W.A. Bass typically gave in its 'credit recovery' program." (emphasis added). Thus, we conclude that the trial court's single-sentence finding suggesting a separate duty to investigate the enrollment decision was harmless error under the circumstances. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). We cannot say that after "considering the whole record," this error "more probably than not affected the judgment." *See Tutton v. Patterson*, 714 S.W.2d 268, 271-72 (Tenn. 1986) (quoting Tenn. R. App. P. 36(b)).

### D.    Foreseeability

We now turn to Metro's final issue on appeal. Metro argues that "Courtlynn's decision to jump out of a second-story window was so outside the realm of reasonable and expected behavior that it was not foreseeable." Metro argues that even if it was generally foreseeable that a high school student would attempt to run away from school, the trial court should have considered the method by which Courtlynn chose to escape here, through a second-story window. It contends that Courtlynn's decision to jump out a second-story window was so unforeseeable that there was no duty to prevent it, and any action on Metro's part was not the proximate cause of her injury.

"[T]he role that the concept of foreseeability plays in the context of a court's determination of the existence and scope of a duty differs from the role the concept plays

when the fact-finder is addressing proximate causation." *Marla H.*, 361 S.W.3d at 532 (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 366 (Tenn. 2008)). As such, "[c]ourts evaluating foreseeability in the context of duty must take a more general approach to the likelihood of harm rather than determining the foreseeability of the specific harm suffered by the plaintiff." *Id*. "[A] risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 551 (Tenn. 2005) (quoting *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992)). "In Tennessee, liability is imposed upon a defendant when the injury caused could reasonably have been anticipated or foreseen." *Tompkins v. Annie's Nannies, Inc.*, 59 S.W.3d 669, 673 (Tenn. Ct. App. 2000). "Foreseeability requires an awareness of a general character of injuries similar to those suffered by the plaintiff. If plaintiff's injuries are of a type that could not have been reasonably foreseen, a duty of care never arises." *Id.* at 674. (citations omitted). Again, "[w]ith specific reference to the conduct of teachers, we do not impose upon them the duty to anticipate or foresee the hundreds of *unexpected* student acts that occur daily in our public schools," but "we have no hesitation in holding a teacher or local school system to the duty of safeguarding students while at school from reasonably foreseeable dangerous conditions[.]" *Roberts*, 692 S.W.2d at 872 (emphasis added).

Metro admits that it was "operating with limited information about [Courtlynn's] background," but it claims this was because DCS did not provide the necessary information to W.A. Bass Learning Center. Again, however, Metro fails to acknowledge what it should have known about Courtlynn. "The pertinent question is whether there was any showing from which it can be said that the defendants reasonably knew *or should have known of the probability of an occurrence such as the one which caused the plaintiff's injuries*." *K.G.R.*, 2016 WL 7230385, at *4 (citing *Church v. Charles Blalock & Sons, Inc.*, 492 S.W.3d 263, 272 (Tenn. Ct. App. 2015)) (emphasis added).

We begin with the principal's admission that this was "not the typical high school program," and these were "not typical high school students." Many of these students came from a wide range of troubled backgrounds, ranging from incarceration to juvenile detention to group homes. All residents of Wallace Group Home had mental health diagnoses, and all began school at W.A. Bass. Students there have attempted to run away from school. As the principal admitted, he had "seen everything" and "nothing would surprise [him] that goes on in there." Despite this, Mr. Ballentine's classroom had a swinging window that "opens like a door," is large enough for a person to walk through, and did not even have a locking mechanism on it. This was not your typical window. Mr. Ballentine himself said he "thought it was crazy to have an unlocked window that big on the second floor, a classroom at that school," and "especially with a group of kids" who require four-to-one supervision. Nevertheless, Mr. Ballentine left his classroom of these atypical students unsupervised for approximately ten minutes. Mr. Ballentine and the principal conceded that the mere presence of a teacher supervising a classroom is a

deterrent to inappropriate behavior by students. W.A. Bass knew that Courtlynn was a special education student from Wallace Group Home and admittedly "knew that Courtlynn had an IEP and qualified for exceptional education services under the umbrella of emotional disturbance." Considering also what the school *should have known* about Courtlynn's mental health and behavior, from her psychological evaluation that was never read, the behavioral assessment that never occurred, and the IEP meeting that was never held, Metro "reasonably . . . *should have known* of the probability of an occurrence such as the one which caused the plaintiff's injuries." *K.G.R.*, 2016 WL 7230385, at *4. An occurrence such as this should have been foreseen through the exercise of reasonable diligence.

Regarding duty, Metro broadly declares that "[u]nder Tennessee law, a defendant has a duty to prevent an individual from jumping out of a window only if the defendant has reason to believe the jump is likely." As support for this assertion, Metro primarily relies on this Court's decision in *Langley v. Metropolitan Government of Nashville and Davidson County*, No. 87-323-II, 1988 WL 123001, at *1 (Tenn. Ct. App. Nov. 18, 1988), which involved a suicidal prisoner who jumped out of a window. In that case, we explained that custodians of prisoners are "required to exercise ordinary and reasonable care for the protection of the life and health of the persons in their custody." *Id.* at *5. "Persons having custody of prisoners are not insurers of the prisoners' safety," and, as a general rule, "do not have a duty to protect inmates from injuring themselves." *Id.* at *5-6. *However*, we explained that the existence of special circumstances "may impose upon the *custodian* the duty to protect an inmate from self-inflicted injury," such as in "situations in which it is reasonably foreseeable that an inmate might harm himself." *Id.* at *6 (emphasis added). We noted two cases in which Tennessee courts had found hospitals liable when hospital patients jumped from windows to their deaths, and "[l]iability in each instance was *predicated on the institution's duty to protect its patient* from self-inflicted harm and upon the foreseeability that the patient might harm himself." *Id.* at *7 (emphasis added). We explained that, "[i]n like manner, custodians of prisoners may also be liable for a prisoner's suicide or attempted suicide if they had a duty of observe and to prevent a prisoner from harming himself." *Id.* at *8. We concluded that "[t]his *heightened duty* can be imposed on the defendants only if Mr. Langley's conduct in jail or the circumstances of his confinement should have alerted them to his potential for self-destruction." *Id.* (emphasis added).

In its brief on appeal, Metro emphasizes this sentence about the "heightened duty" to argue that liability can be imposed on it "***only if***" its staff "had knowledge that Courtlynn was likely to jump out of a second-story window or engage in some other type of serious act of self-harm if left unsupervised." It also cites the two cases discussed in *Langley* involving hospital patients, claiming that "[i]n Tennessee cases where defendants have been held liable for an individual's decision to jump out of a window, there was proof that the defendants had knowledge *that the individual was likely to engage in self-harm*."

Again, however, Metro's reliance on these "heightened duty" cases is misplaced. "Tennessee courts have recognized in both prison and psychiatric hospital settings that custodians have an affirmative duty to prevent the occurrence of foreseeable harm to individuals in their custody."[20] *Haynes v. Wayne Cnty.*, No. M2016-01252-COA-R3-CV, 2017 WL 1421220, at *6 (Tenn. Ct. App. Apr. 19, 2017). Thus, the scope of the duty owed by prison officials "'can be expanded to include self-inflicted injury or death when the prison officials know or should know that the prisoner might harm himself or herself.'" *Id.* (quoting *Cockrum v. State*, 843 S.W.2d 433, 436 (Tenn. Ct. App. 1992)). "[I]n both prison and psychiatric hospital settings, the courts consistently hold that custodians have a duty to protect prisoners or patients from reasonably foreseeable self-destructive acts." *Cockrum*, 843 S.W.2d at 436. In other words, in these settings, courts have recognized "a heightened standard of care with regard to foreseeable self-destructive acts." *See id.* However, this case does not involve a prison or psychiatric hospital. The rule discussed in *Langley* is simply inapplicable under the facts of this case, involving a student's attempt to run away from school.[21]

For essentially the same reasons, Metro argues that the lack of foreseeability precludes a finding of proximate cause. Metro compares this case to *Lanier v. City of Dyersburg*, No. W2009-00162-COA-R3-CV, 2009 WL 4642601, at *1, *5 (Tenn. Ct. App. Dec. 9, 2009), where we held that sexual contact in a bathroom stall between 11-year-old and 13-year-old special education students was "at most, a remote possibility, and it was

---

[20] To illustrate, in *Haynes*, 2017 WL 1421220, at *7-9, we explained that suicidal statements made by an intoxicated arrestee when he arrived at the jail "triggered Defendant's heightened duty to protect him from self-inflicted harm," but the heightened duty expired when he told an officer several hours later "that he was just drunk and did not mean it when he expressed a desire to commit suicide," meaning "Defendant only had a duty to exercise ordinary and reasonable care for Mr. Haynes's protection for the remainder of his time in its custody and in releasing him."

[21] In *Kim v. State*, 622 S.W.3d 753, 768-69 (Tenn. Ct. App. 2020), we rejected the plaintiffs' invitation to impose a heightened duty on innkeepers who invite children to their establishments:

> [T]he *Whirley* case has not been held to create a heightened standard of care in all circumstances involving children. Rather, on many occasions, we have expressly held that defendants who regularly interact with children are not insurers of their safety. *See, e.g.*, *Denson v. Dr. Benjamin*, No. 01A019810CV00571, 1999 WL 824346, at *3 (Tenn. Ct. App. Aug. 12, 1999) (citing *Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d 863, 870 (Tenn. Ct. App. 1985)) ("[O]ur courts have stated more than once that schools are not expected to be insurers of the safety of children while they are at school."); *City of Kingsport v. Lane*, 35 Tenn. App. 183, 190, 243 S.W.2d 289, 292 (1951) (involving municipalities); *Town of Clinton v. Davis*, 27 Tenn. App. 29, 36, 177 S.W.2d 848, 851 (1943) (involving electric companies). The Kims do not cite a single case, nor has our research revealed any, in which a heightened standard of care has been imposed on innkeepers to their child guests under *Whirley*. As an intermediate appellate court, "it is not our prerogative to set policy[.]" *Vulcan Materials Co. v. Gamble Const. Co.*, 56 S.W.3d 571, 575 (Tenn. Ct. App. 2001) (citing *Cavender v. Hewitt*, 145 Tenn. 471, 239 S.W. 767, 768 (Tenn. 1922)). We therefore decline the Kims' invitation to essentially require innkeepers to be the insurers of children's safety.

- 50 -

certainly not a reasonably foreseeable probability." We explained that school officials had not observed or been advised of any behavior that would indicate the perpetrator posed a risk of harm to other students, and the special education supervisor "stated that she had reviewed all of [the child's] records and intake information, including a recent psychological evaluation, and that none of that information suggested that [she] had any physically or sexually aggressive tendencies or that she required supervision in the restroom." *Id.* Although the mother "seem[ed] to suggest that any special education student with a history of being abused needed supervision in the restroom," she admitted that her own daughter "was also a special education student with a history of abuse" but "did not need supervision in the restroom." *Id.* Quoting this language, Metro argues on appeal that "notice of a student's learning disability alone does not provide notice that a student has a propensity towards particular actions." Metro also points again to this Court's decision in *Phillips*, 2012 WL 3984637, at *6, where the school system was aware of Jacob's diagnosis of Asperger's and knew about his special needs. Metro claims that it "had significantly less information than the schools had in [those] cases." Yet again, Metro erroneously focuses only on what it knew.

When considering proximate cause, we determine whether "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *Cotten v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019) (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)).

> Foreseeability is the crucial factor in the proximate cause test because, if the injury that gives rise to a negligence case could not have been reasonably foreseen, there is no proximate cause and thus no liability despite the existence of negligent conduct. "A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." However, "[t]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility."

*Id.* (quoting *King v. Anderson Cnty.*, 419 S.W.3d 232, 248 (Tenn. 2013)). Because foreseeability must be determined as of the time of the acts or omissions claimed to be negligent, "we focus on the facts that were available to the Defendant at the time[.]" *Id.* at 651; *see, e.g.*, *Wilson v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2008-00327-COA-R3-CV, 2009 WL 196033, at *4 (Tenn. Ct. App. Jan. 27, 2009) ("The evidence demonstrates that a reasonable person would know *or should have known* that Wilson was in danger prior to the attack. . . . [A] reasonably prudent person could have easily appreciated the danger of the situation and taken action to prevent it.") (emphasis added).

We also note that "[p]roximate cause is an issue of fact to be determined by the fact-finder." *Kim*, 622 S.W.3d at 760 (citing *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 905 (Tenn. 1996)). "[T]he trial court's findings regarding foreseeability are, therefore,

entitled to a presumption of correctness." *Zukowski ex rel. Zukowski v. Hamilton Cnty. Dep't of Educ.*, 640 S.W.3d 505, 517 (Tenn. Ct. App. 2021) (quoting *Phillips*, 2012 WL 3984637, at \*4). "[T]he particular facts involved are highly relevant in determining foreseeability." *Kim*, 622 S.W.3d at 766.

In *Haney v. Bradley County Board of Education*, 160 S.W.3d at 888, 899, we considered a tragic case in which two students were signed out of school by their father and then murdered, and the defendant school board similarly argued that the brutal murder of the children was so unforeseeable that the plaintiff's claim must be dismissed. However, we emphasized troubling statements the father wrote on the school sign-out sheet before he left with them, which no one from the school even read at the time. *Id.* at 899. We explained that the written reasons "were not innocuous and were clearly troubling to the School once the School personnel read them," after he and the children were already gone. *Id.* One teacher testified that she became concerned once she read the comments because they were not normal. *Id.* The principal testified that once she read the comments, she was concerned enough to go outside to see if they had left, then she showed them to the school resource officer. *Id.* Thus, we concluded that a genuine issue of material fact existed regarding foreseeability, particularly "regarding whether the actual harm inflicted on these children *would have been foreseeable had someone at the School read [the father's] reasons* for checking out the children before the children were released to him." *Id.* (emphasis added).

We conclude that the harm in this case would have been foreseeable had someone at W.A. Bass simply read the information in Courtlynn's psychological evaluation and conducted the necessary behavioral assessment and IEP meeting for her. The information was readily available; the school simply ignored it until after Courtlynn's injury. Her teacher was shocked and "flabbergasted" by what she learned during the post-injury IEP meeting. As the trial court noted, however, by then, it was too late.

Metro also argues, "While it may be reasonably foreseeable for a high school student to sneak out of a ground-level door, that is not the case when the method of escape is a second-story window." However, "the foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred." *Moore v. Houston Cnty. Bd. of Educ.*, 358 S.W.3d 612, 619 (Tenn. Ct. App. 2011) (quoting *Mason ex rel. Mason v. Metro. Gov't of Nashville and Davidson Cnty.*, 189 S.W.3d 217, 222 (Tenn. Ct. App. 2005)). "The fact that an accident may be freakish does not *per se* make it unpredictable or unforeseen. It is sufficient that harm in the abstract could reasonably be foreseen." *McClenahan*, 806 S.W.2d at 775 (citation omitted); *see, e.g.*, *Moore*, 358 S.W.3d 612, 619-20 (explaining that an attack on a student was foreseeable, and the fact that the aggressor solicited another student to carry out his threat did not make the assault unforeseeable, as "[t]he Board was not required to foresee the exact manner in

which the attack would be carried out in order to be held negligent"). "The exact manner in which the injury occurred need not be foreseen so long as the general manner in which the injury occurred was foreseeable, *or should have been foreseen through the exercise of reasonable diligence*." *Crutchfield v. State*, No. M2015-01199-COA-R3-CV, 2016 WL 1601309, at *7 (Tenn. Ct. App. Apr. 18, 2016) (citing *Rathnow v. Knox Cnty.*, 209 S.W.3d 629, 633 (Tenn. Ct. App. 2006)) (emphasis added). "Proximate cause will be found if 'some such harm of a like general character was reasonably foreseeable as a likely result of defendant's [specific act of negligence].'" *Kim*, 622 S.W.3d at 765 (quoting *Spivey v. St. Thomas Hosp.*, 211 S.W.2d 450, 457 (Tenn. Ct. App. 1947)); *see also Mullins v. Redmon*, No. W2007-00616-COA-R3-CV, 2007 WL 4415266, at *4 (Tenn. Ct. App. Dec. 19, 2007) ("[T]he foreseeability requirement does not require that the School District foresee the exact manner in which the injury takes place, provided it is determined that the School District could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred."). The evidence does not preponderate against the trial court's finding of foreseeability as an element of proximate cause.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to the appellant, Metropolitan Government of Nashville & Davidson County, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE